**1756, INC., et al., Plaintiffs,**

v.

**The ATTORNEY GENERAL OF the UNITED STATES of America, Defendant.**

**Civ. A. No. 89–2423–LFO.**

United States District Court, District of Columbia.

Aug. 23, 1990.

Philip J. Hare, Marie C. Marcoux, Washington, D.C., for plaintiffs.

Michael T. Ambrosino, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiff 1756, Inc., petitioned the Immigration and Naturalization Service (INS) on behalf of plaintiff Stanislaus Noronha for a temporary visa. 1756 hoped to transfer Noronha for one year from a restaurant in Kuwait owned by its parent corporation to a newly opened operation in Florida. The INS's Southern Regional Center ("Region") refused to issue an L–1 visa for Noronha or for his five similarly situated colleagues, and the INS Administrative Appeals Unit ("Appeals Unit") dismissed 1756's appeal on behalf of Noronha. Plaintiffs now seek to overturn the INS decision.

Plaintiffs and defendant have filed cross-motions for summary judgment. Because this case is to be decided entirely upon the administrative record as supplemented, *see* Order of March 1, 1990, there are no genuine issues as to any material question of fact. This Court may therefore proceed to resolve the case based upon the pleadings and the record. *See* Fed.R.Civ.Proc. 56(c). For the reasons stated below, defendant's cross-motion for summary judgment should be granted, and plaintiffs' suit dismissed.

### I.

Plaintiff 1756, Inc., is a Florida corporation owned by Lawrence D'Souza and Ghazi Yousof Al–Abdul Razzak, both restaurateurs primarily based in Kuwait.[1] Their primary venture is the Caesar's Group of Restaurants, parent corporation of 1756, which features Indian and oriental cuisine.

---

1. The corporate ownership scheme is complicated. D'Souza and Razzak own 50% of 1756, Inc.; the other 50% is owned by Silver Sea Restaurant International NV, a Dutch corporation owned by D'Souza and Razzak. 1756 and Silver Sea are in turn subsidiaries of the Caesar's Group of Restaurants, which is owned in equal shares by D'Souza and Razzak. *See* Complaint ¶ 6.

*See* Complaint ¶ 6. Since 1983, the year 1756 was incorporated, D'Souza and Razzak have been preparing to establish a chain of their restaurants in the United States. The first such restaurant has recently opened in Altamonte Springs, Florida, just outside of Orlando. *See id.* ¶ 14.

1756 seeks temporary visas for the six employees of the Caesar's Group: Noronha, Kheong Chung, Laxman Poova Suvarna, Chu Fung Shong, Raveendra K. Mandal, and Phillip Jack Oswald Santhamaria. Each is a chef currently living in Kuwait and working for the Caesar's Group. All are trained in one or more of 1756's methods for preparing Mughlai, Tandoori, oriental Indian, and continental cuisine. *See id.* ¶¶ 7–12. D'Souza and Razzak would like to bring these chefs to the Altamonte Springs restaurant for a year to train local chefs in the Caesar's Group's culinary techniques. *See id.* ¶ 15.

In June of 1988, five years after 1756 was incorporated, 1756 petitioned the INS for visas on behalf of the six chefs under the intracompany transferee provisions of 8 U.S.C. § 1101(a)(15)(L). That section allows multinational business to petition the INS for "L-1 visas" on behalf of employees those businesses which to temporarily transfer to their American operations. *See* H.R.Rep. No. 91–851, 91st. Cong., 2d Sess. 3–4 [hereinafter "House Report"], U.S. Code Cong. & Admin.News 1970, pp. 2750, 2753–2754. To qualify, the petitioning business must show that it has employed the beneficiary for at least a year; that the beneficiary plans to continue rendering services to the petitioner; and that the beneficiary would serve "in a capacity that is managerial, executive, or involves specialized knowledge." 8 U.S.C. § 1101(a)(15)(L) (1988).

On August 19, 1988, the Region denied 1756's petitions. In nearly identical opinions, it found that the beneficiaries were not employed in a capacity involving "specialized knowledge." *See, e.g., Matter of Noronha*, SRC–N–17663 (August 19, 1988),

*in* Administrative Record, SRC–N–17663, at 67 (filed January 18, 1990) [hereinafter "Noronha Record"]. The Region also rejected plaintiffs' motions to reconsider. *See Matter of Mandal*, SRC–N–17666 (December 9, 1988), *in* Administrative Record, SRC–N–17666, at 1 (filed January 18, 1990) (denying motion to reconsider for all beneficiaries except Noronha); *Noronha Record* at 31 (denying motion to reconsider, January 17, 1989). 1756 appealed Noronha's case to the Appeals Unit.[2]

The Appeals Unit agreed that the petitioner 1756 had not proven that the beneficiary Noronha would be employed in a specialized knowledge capacity. *See Noronha Record* at 2 (July 17, 1989). Reviewing the relevant factors, the Appeals Unit found little evidence Noronha was employed in a specialized knowledge capacity. In the opinion of the Appeals Unit, petitioner failed to establish that the beneficiary would be doing more than merely providing a product or performing a service. 1756 provided no evidence that the beneficiary was a key employee abroad. It did not prove that Noronha had gained his knowledge of cooking through access to proprietary information, nor did it present evidence that the Caesar's Group had any proprietary knowledge, such as recipes over which it had exclusive rights, to bestow. Finally, petitioner failed to provide any evidence of how Noronha's skills unusually enhanced his employer's productivity and competitiveness. In light of the petitioner's burden of proof, *see* 8 U.S.C. § 1361 (1988), the Appeals Unit concluded petitioner had failed to demonstrate Noronha was employed in a specialized knowledge capacity and dismissed the appeal.

Plaintiffs claim that the INS employed an unduly restrictive interpretation of specialized knowledge. They also claim that the present regulations were improperly promulgated. Finally, plaintiffs assert that the record provides ample evidence of Noronha's and the other chefs' specialized

---

**2.** 1756, Inc., also filed supplemental motions with the Region on the other five. The SRC, however, stayed those proceedings pending the Commission's ruling. *See* Letter from Al Gallmann to Marie C. Marcoux (April 4, 1989), *in* Supplemental Administrative Record, Exhibit C (filed March 1, 1990) [hereinafter "Supplemental Record"].

knowledge, and the INS's refusal to recognize this proof was arbitrary and capricious. These contentions are examined in the sections below.

## II.

■ Plaintiffs contend that the INS regulation defining specialized knowledge capacity, 8 C.F.R. § 214.2(1)(1)(ii)(D) was promulgated improperly. The regulation, they claim, was adopted in the face of significant criticism. Moreover, plaintiffs assert the INS rejected without explanation three cases decided contemporaneously with the passage of the 1970 amendments. *See Matter of LeBlanc*, 13 I. & N. Dec. 816 (R.C.1971); *Matter of Vaillancourt*, 13 I. & N. Dec. 654 (R.C.1971); *Matter of Raulin*, 13 I. & N. Dec. 618 (R.C.1970). Upon analysis, both contentions must be rejected.

The first contention is meritless. The proposed rule was criticized because it required that the petitioner's knowledge be unique and narrowly held in the organization. In the final rule, the INS responded by reinstating "the standard that knowledge which is not readily available in the United States should be considered in determining specialized knowledge." Final Rule, 52 Fed.Reg. 5738, 5741 (1987). Plaintiffs do not specify what criticisms were outstanding after this response. Absent any evidence that the INS disregarded other criticisms, the INS is entitled to a presumption of regularity. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

■ Similarly, plaintiffs cannot fairly contend that the agency's regulation is infirm merely because it rejects an earlier interpretation. In *Chevron U.S.A., Inc., v. Natural Resources Defense Council*, the Court deferred to an agency interpretation even though it presented a complete about-face. *See* 467 U.S. 837, 857–58, 104 S.Ct. 2778, 2789, 81 L.Ed.2d 694 (1984). An administrative agency need only "bear[ ] the burden of rationally explaining its departure from its previous interpretation." *General American Transp. Corp. v. I.C.C.*, 872 F.2d 1048, 1054 (D.C.Cir.1989)

(citing *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 41–44, 103 S.Ct. 2856, 2865–67, 77 L.Ed.2d 443 (1983)). Moreover, in an informal rulemaking procedure an agency need not provide an extensive explanation. It need only "incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c) (1988). The INS easily satisfies that standard.

■ The INS' rationale is clear, though it requires some digging to find it. The new regulation was meant to "better articulate the case law." Final Rule, 52 Fed. Reg. at 5740–41. Consequently, its rationale is embedded in the cases codified. These cases make two points with regards to *LeBlanc*, *Raulin*, and *Vaillancourt*. First, they argue, there is no conflict between the new standard and these early regional decisions. "[T]he *LeBlanc* and *Raulin* decisions did not find that the occupations inherently qualified the beneficiaries for the classifications sought." *Matter of Penner*, 18 I. & N. 49, 52 (1982). Instead, the later cases read these early decisions as finding that the particular beneficiaries had unusual duties which involved the sort of specialized knowledge contemplated by Congress. *Id.* Second, to the extent the later cases reject the earlier ones, it is because earlier cases are in error. The early cases largely ignored the legislative history. The later cases, however, noted in the legislative history a clear intent to limit the L–1 category to "key personnel," *see* House Report at 5–6, and consequently adopted a narrow definition of specialized knowledge. *See Penner*, 18 I. & N. Dec. at 50–52; *Matter of Colley*, 18 I. & N. Dec. 117, 119 ((1981). Therefore, to the extent the earlier cases adopted a broad definition, they were erroneous, and the new regulations were necessary to "conform Service policy to the intent of Congress." Final Rule, 52 Fed.Reg. at 5738.

## III.

■ *Chevron* governs the review of an agency's interpretation. In that landmark case, the Supreme Court announced the general rule that where there is a gap

in a statute, "there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Id.* 467 U.S. at 843–44, 104 S.Ct. at 2782. Agencies may, indeed are expected to, alter and refine their interpretation of what fills such gaps through the exercise of their technical expertise, their assessment of the wisdom of the implicated policies, and their experience with the day-to-day operation of rules designed to implement these policies. *See id.* at 865–66, 104 S.Ct. at 2792–93. Judicial review must therefore be deferential.

 Specifically, the Court adopted a two-pronged test:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82 (citations omitted). Thus, the INS need only adopt an interpretation that fits within the parameters set by Congress. If the statute is clear, there may only be one such interpretation. By contrast, if the statute is ambiguous or incomplete, there may be many such interpretations. In such cases, a reviewing court's task is not to determine whether the INS has chosen the best possible interpretation but rather whether that choice is supported by reasonable arguments.

## A.

 The term "specialized knowledge" appears as part of the definition of the class of individuals qualifying for favorable "nonimmigrant" status under 8 U.S.C. § 1101(a)(15)(L) (1988):

an alien who, immediately preceding the time of his application for admission into the United States has been employed continuously for one year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge, and the alien spouse and minor children of any such alien if accompanying him or following to join him.

"Specialized knowledge" is not defined in the Immigration and Nationality Act, nor is it a term of art drawn from case law or from another statute. Nonetheless, plaintiffs maintain its meaning is plain. In support, they quote a dictionary definition of to specialize: " 'to concentrate on a special branch of study, work etc.' " *See* Plaintiffs' Motion for Summary Judgment at 14 (quoting *Webster's New Word Dictionary* (School and Office ed. 1970)). They do not, however, provide a verbal formulation, most probably because the definition they have chosen is circular. It uses the concept of special in defining to specialize and thus sheds little light on the meaning of specialized knowledge capacity.

This ambiguity is not merely the result of an unfortunate choice of dictionaries. It reflects the relativistic nature of the concept special. An item is special only in the sense that it is not ordinary; to define special one must first define what is ordinary. For example, a carpenter who concentrates on putting different parts of furniture together (a joiner) would have specialized knowledge in comparison to a neophyte carpenter who has not yet concentrated on any particular aspect of the craft. In comparison to a scientist or doctor, even a general practitioner, however, that joiner's knowledge may seem quite ordinary. These two examples use different baselines for ordinary knowledge: in the first case, ordinary knowledge is the minimum level of information and skill needed to participate in a profession; in the second case,

ordinary knowledge is nonscientific knowledge. There is no logical or principled way to determine which baseline of ordinary knowledge is a more appropriate reading of the statute, and there are countless other baselines which are equally plausible. Simply put, specialized knowledge is a relative and empty idea which cannot have a plain meaning. *Cf.* Westen, *The Empty Idea of Equality*, 95 Harv.L.Rev. 537 (1982).

It is possible that the context in which specialized knowledge was used would make its meaning clear by providing a baseline. Here, specialized knowledge refers to a capacity, a position of employment. It is also the final item in a list of capacities: "managerial, executive, or involves specialized knowledge." Thus, a specialized knowledge capacity must be similar, yet not identical, to a managerial or executive capacity. The statute, however, gives little idea of what the relevant similarities are. More importantly, the little that can be derived from context—that a specialized knowledge capacity is similar to an executive capacity—suggests that employment as a chef may not be such a capacity.

The meaning of the statute also remains ambiguous after the "traditional tools of statutory construction" have been applied. *Cf. NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) (citing *INS v. Cardozo–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). Although plaintiffs claim that the legislative history evinces a clear and unqualified intent, they do not spell out how that intent compels a particular interpretation. Indeed, the legislative history is virtually silent on the meaning of the phrase "specialized knowledge." It is not discussed in the floor debates or in the committee reports. The only mention of the phrase is in a committee hearing, which suggests that the legislation was not meant to include " 'skilled craft workers or people of that sort.' " *Penner*, 18 I. & N. Dec. at 50 (quoting *Hearings before Subcommittee No. 1 of the Committee on the Judiciary, House of Representatives*, 91st Cong., 2d Sess. 205, 248 (1970)).

Plaintiffs cannot therefore fairly contend that the Congress has spoken on the question before the Court or that its intent is clear. To the extent that plaintiffs argue that the INS' restrictive interpretation frustrates the purposes of the statute, their contentions speak to the reasonableness of the INS' interpretation and the second prong of the *Chevron* test.

## B.

When a statute is ambiguous, courts must defer to an agency's interpretation "as long as it is rational and consistent with the statute." *United Food & Commercial Workers Union*, 484 U.S. at 123, 108 S.Ct. at 421. As an initial matter, the INS' interpretation seems to satisfy this lenient standard. According to INS regulations,

"Specialized knowledge" means knowledge possessed by an individual whose advanced level of expertise and proprietary knowledge of the organization's product, service, research, equipment, techniques, management, or other interests of the employer are not readily available in the United States labor market. This definition does not apply to persons who have general knowledge or expertise which enables them merely to produce a product or provide a service.

8 C.F.R. § 214.2(1)(1)(ii)(D) (1990). This regulation adopts the natural reading that a specialized knowledge capacity should be analogous to a managerial or executive capacity. It should not include mere expertise which enables one "merely to produce a product or provide a service." Instead, the employees covered should be especially valuable employees who, like managers and executives, rank high in the business' hierarchy.

Moreover, the legislative history provides ample support for a somewhat restrictive interpretation. The legislative history demonstrates a concern that the L–1 category will become too large: "The class of persons eligible for such nonimmigrant visas is narrowly drawn and will be carefully regulated and monitored by the Immigra-

tion and Naturalization Service." House Report at 6, U.S.Code Cong. & Admin. News 1970, p. 2754. The INS has determined that "[m]ost employees today are specialists and have been trained and given specialized knowledge." *Colley,* 18 I. & N. Dec. at 119. In light of Congress' intent that the L–1 category should be limited, it was reasonable for the INS to conclude that specialized knowledge capacity should not extend to all employees with specialized knowledge. On this score, the legislative history provides some guidance: Congress referred to "key personnel" and executives. *Id.* at 5–6, U.S.Code Cong. & Admin.News 1970, p. 2754.

Plaintiffs contend that these bits of the legislative history are anomalous. "Taken as a whole," they claim, "the legislative history makes clear Congress' overriding intent to facilitate the free flow of managerial and technical personnel from abroad to the United States for the purpose of encouraging the growth of multinational business." Plaintiffs' Motion for Summary Judgment at 15–18. The House Report is, however, quite short, consisting of only three pages. Given that length, it is hard to dismiss any part as anomalous. More importantly, even if Congress' primary motive was to facilitate international businesses, that motive clearly did not override all other purposes. The L–1 classification does not allow permanent immigration regardless of how crucial an employee may be to a business, nor does it allow all useful personnel to obtain visas. Congress tempered its intent to facilitate expansion of international business with other concerns, particularly long standing exclusionary policies. *See, e.g.,* T. Aleinikoff & D. Martin, *Immigration Process and Policy* 1–81 (1985). In light of these conflicting purposes, it cannot be said that the line the INS has drawn frustrates Congress' purposes merely because it will have an adverse affect on 1756, Inc., and the Caesar's Group.

■ Plaintiffs also contend that the INS has excluded an entire class of employees—chefs—from consideration for L–1 visas. *See* Plaintiff's Motion for Summary Judgment 15. As evidence, they cite the concluding portion of INS Operating Instruction 214.2(5)(i)(B): "chefs and specialty cooks are not considered to have specialized knowledge, even though they may have knowledge of a restaurant's special recipes." This contention is easily dismissed. In the first place, this nonbinding operating instruction was not applied by the Appeals Unit and is therefore not properly before this Court. *See Securities & Exchange Commission v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *see also. Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2466–67, 45 L.Ed.2d 522 (1975) (limiting review to final agency actions in order to give agencies the opportunity to correct their mistakes and develop an adequate record for judicial review). Just as importantly, the operating instruction does not categorically eliminate a candidate merely because he or she is a chef. It is true that someone who only works as a chef cannot be found to be employed in a specialized knowledge capacity, but this does not mean that chefs who take on other responsibilities cannot qualify. The INS has "looked for elements beyond general job tasks and duties" which demonstrate an "essential knowledge ... not readily available in the job market." *Colley,* 18 I. & N. Dec. at 120.

Finally, plaintiffs argue that the INS has admitted that its regulations were too restrictive. As evidence, they cite a letter issued by the Associate Commissioner for Examinations. *See* Interpretation of Specialized Knowledge Under the L Classification, October 17, 1990, *in* Supplemental Record, Exhibit G–6. In that letter, Richard Norton, an associate commissioner, asserts that in the 18 months in which the new specialized knowledge regulations have been implemented the INS has often used "a too literal definition of the term 'proprietary knowledge' wherein the knowledge must relate exclusively to or be unique to the employer's business operation." *Id.* The letter explained that possession of proprietary knowledge indicates specialized knowledge capacity but it is not a necessary condition. This adjustment in

the interpretation of the regulation does not, however, suggest that the regulations themselves are too restrictive. It suggests that the application of them has been too restrictive, but that fact is irrelevant here where the Appeals Unit applied the multi-factor test outlined in the letter. Indeed, there would be no reason to issue an interpretive statement at all if the regulations could not be properly interpreted more expansively.

### C.

In conclusion, the INS' interpretation of specialized knowledge capacity is well within the parameters defined by Congress. The phrase "specialized knowledge" is meaningless by itself, undefined by the statute, unclear from context, and barely mentioned in the legislative history. The INS' reading is a reasonable one. It reflects a natural reading of the text and balance the conflicting purposes evidenced in the legislative history. Under *Chevron*, the agency's interpretation must therefore be sustained.

### IV.

██ Plaintiffs' also claim they presented clear proof of specialized knowledge, but the INS arbitrarily refused to recognize it. To succeed in this claim, plaintiffs must satisfy a heavy burden. Applicants for a visa always have to bear the burden of proof. *See* 8 U.S.C. § 1361 (1988). Upon review, the INS' decision may only overturned if was "arbitrary, an abuse of discretion, otherwise not in accordance with the law." *See* 5 U.S.C. § 706(2)(A) (1988); *see Mazaleski v. Treusdell,* 562 F.2d 701 (D.C.Cir.1977). Thus, to overturn the INS' determination the plaintiffs must either show that INS did not have significant grounds for its decision, that the INS considered impermissible factors, or that there was a clear error in judgment. *See Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24.

Plaintiffs do not suggest that the INS has considered impermissible factors, nor can they argue that its factual findings are not explained. The Appeals Unit's decision runs through the factors outlined by Commissioner Norton point-by-point. *See Noronha Record* at 3–4. Instead, they take up the quite formidable challenge of proving a clear error in judgment. Their first argument is that the INS itself has found that plaintiffs have specialized knowledge but arbitrarily refused to recognize this finding. 1756 contends that because the Region found that its "specialized cuisine is unique," it was arbitrary for the Region, and the Appeals Unit, to refuse to attribute specialized knowledge to the chefs who prepare that cuisine. This contention, however, assumes that specialized knowledge capacity requires no more than a showing of some specialization. As discussed above, the INS has adopted a different reading of that statute. As a consequence, it cannot be argued that the INS has refused to recognize its own findings.

██ Plaintiffs also assert that they have satisfied the standards set out in Associate Commissioner Norton's interpretive memo. Specifically, they claim that the recipes used by the Caesar's Group are unique and prepared in a proprietary manner, that the chefs are key personnel, and that there are no chefs with similar skills available. For the most part, however, plaintiffs' assertions concerning the uniqueness of the Caesar's Group technique and the abilities of the chef-beneficiaries are just that—conclusory assertions. Plaintiffs do not, for example, describe how their cuisine differs or enumerate the special skills their chefs have. Given the petitioner's burden of proof, the INS did not act arbitrarily when it refused to credit those assertions.

Moreover, INS could easily have discounted the evidence plaintiffs did present. The plaintiffs presented several newspaper articles. Because there is no way to verify the writers' sources or their expertise, this evidence is not particularly probative. The main evidence on which plaintiffs chiefly rely is an advertisement run in *The Orlando Sentinel* on November 4, 5, and 6, 1987. *See Noronha Record* at 38 (Motion to Reopen and Reconsider and Brief in Support Thereof). The advertisement sought "1

Tandoori chef, 1 Indian pastry chef, 1 Mughlai Indian chef, 1 General Indian Chef." *Id.* at 66 (Exhibit 12 to Motion to Reconsider). Because the advertisement was not answered, plaintiffs conclude that there were no qualified chefs readily available. It is, however, possible to reach a very different conclusion. The advertisement offered only a temporary position and at a rate of $6.50 an hour. *See id.* An equally plausible explanation would be that no qualified chef would be interested in working for such low wages, especially if he had no assurance of job security. Indeed, if the Indian, Tandoori, and Mughlai chefs sought are highly skilled, it would be expected that they would be able to secure more attractive terms of employment. The INS was well justified in disregarding this evidence.

### V.

For these reasons, in the accompanying order plaintiffs' motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and this action is dismissed with prejudice.