NATIONAL HAND TOOL CORP.,
Plaintiff–Appellant,

v.

K.L. PASQUARELL, Director Regional Service Center, United States Immigration and Naturalization Service, Defendant–Appellee.

No. 88–7030.

United States Court of Appeals,
Fifth Circuit.

Dec. 15, 1989.

Eugenio Cazorla, Cazorla, Bates & Turin, Dallas, Tex., for plaintiff-appellant.

Marvin Collins, U.S. Atty., Dallas, Tex., Donald A. Couvillon, Charles E. Pazar, Washington, D.C., for defendant-appellee.

Before JOHNSON, WILLIAMS and GARWOOD, Circuit Judges.

JOHNSON, Circuit Judge:

National Hand Tool Corporation appeals from a summary judgment in favor of the Immigration and Naturalization Service upholding the denial of a visa application. For the reasons cited herein, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

In April, 1984, an L-1 non-immigrant visa, valid until April 1987, was approved for Ru–Huan Chang (hereafter Chang), an employee of the National Hand Tool Corporation.[1] National Hand Tool Corporation (hereafter NHT), a subsidiary of a Taiwanese company, employed Chang as manager of NHT's auditing department after Chang was transferred from the parent company. In October 1985, NHT petitioned the Immigration and Naturalization

---

1. The L-1 visa is available to an applicant who immediately proceeding the time of his application ... has been employed continuously for one year by a firm or corporation ... and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge....

8 U.S.C. § 1101(a)(15)(L).

Service (hereafter INS) to grant Chang a sixth preference permanent immigrant visa. Such a visa would allow Chang, as an NHT employee, to remain in the United States as a permanent resident alien.

Typically an employer or immigrant petitioning for a permanent immigrant visa is required to secure a certificate from the Secretary of Labor to the effect that there are no domestic workers to fill the immigrant's job and that the employment of an alien will not adversely affect the domestic work force. 8 U.S.C. § 1182(a)(14). NHT's petition on behalf of Chang in the instant case, however, came under a special "pre-certified" category of intracompany transferees, who:

> have been admitted to the United States in order to work in, and who are currently working in, managerial or executive positions with the same international corporations or organizations with which they were continuously employed as managers or executives outside the United States for one year before they were admitted.

20 C.F.R. § 656.10(d) (schedule A, group 4).

In support of NHT's petition, NHT submitted a letter which had been originally used as part of the application for Chang's L-1 visa. The letter described Chang's duties in his position as supervisor of the auditing department. The INS, however, after reviewing the NHT's application and supporting letter, was not satisfied that Chang met the criteria for a permanent resident visa. Accordingly, the INS requested that NHT provide additional infor-

mation regarding Chang's managerial responsibilities. NHT responded to the INS request by asserting that Chang had the right to hire and fire members of his staff, and supervised three employees.

On January 20, 1987, the INS, through its Southern Regional Service Center, denied NHT's petition. The basis for the denial was an INS determination that Chang's managerial duties did not constitute a preponderance of his services to NHT. The INS' determination to that effect was ostensibly based on the 1983 definition of "managerial capacity" which was in effect at the time of the initial adjudication.[2] NHT thereafter appealed the INS' decision to the Administrative Appeals Unit.

The INS Administrative Appeals Unit (hereafter Appeals Unit), affirming the INS' original determination that NHT had not demonstrated that Chang's managerial duties fell within prescribed guidelines, dismissed NHT's appeal. In so holding, the Appeals Unit had applied the new definition of "managerial capacity" in effect at the time the appeal was decided. That new definition, which became effective in March 1987, was essentially the same, but had added an additional requirement that the manager "*primarily* direct" the organization or department and "control[ ] the work of other supervisory, professional, or managerial employees." *See* 8 C.F.R. § 214.2(1)(1)(ii)(B) (1988) (emphasis supplied).[3]

---

**2.** Under the 1983 regulations, "managerial capacity" was defined as:
An assignment within an organization in which the employee directs the organization or a customarily recognized department or subdivision of the organization, controls the work of other employees, has the authority to hire and fire or recommend those actions as well as other personnel actions (promotion, leave authorization, etc.) and exercises discretionary authority over day-to-day operations. This does not include the first-line level of supervision unless the employees supervised are managerial or professional.
8 C.F.R. § 214.2(1)(ii)(A) (1984).

**3.** The 1987 definition defined "managerial capacity" as:

[a]n assignment within an organization in which the employee *primarily* directs the organization or a department or subdivision of the organization, supervises and controls the work of other supervisory, professional, or managerial employees, has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization), and exercises discretionary authority over day-to-day operations. The term manager does not include a first-line supervisor, unless the employees supervised are professional, nor does it include an employee who primarily performs the tasks necessary to produce the product and/or to provide the service(s) of the organization.

Thereafter, NHT sought review in the district court of the INS Appeals Unit's decision. Both sides moved for summary judgment. The district court granted the INS motion, concluding that substantial evidence supported the INS' decision that Chang was not employed by NHT in a managerial capacity. In reaching that conclusion, the district court, like the INS Appeals Unit, applied the 1987 definition of "managerial capacity" found in 8 C.F.R. § 214.2(1)(1)(ii)(B). The district court also concluded that the INS did not abuse its discretion by adopting the 1987 definition of "managerial capacity," and that the new definition did not run contrary to the terms of the statute governing the grant of permanent resident visas.

NHT thereafter filed this timely appeal.

## II. DISCUSSION

■ It is well settled that the applicant for a visa bears the burden of establishing eligibility. A denial by the INS of an application for a visa may be reversed only if the decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). Although a reviewing court is bound to ensure that the INS engaged in "reasoned decision-making" in denying an application, *United States v. Garner*, 767 F.2d 104, 116 (5th Cir.1985) (citations omitted), the INS is entitled to considerable deference in its interpretation of the governing statute. *See City of Austin, Brackenridge Hospital v. Heckler*, 753 F.2d 1307, 1313 (5th Cir.1985).

■ NHT contends that application of the 1987 definition of "managerial capacity" which requires that an applicant *primarily* direct the operations of the organization or department and control the work of other supervisory, professional, or managerial employees is inconsistent with the provisions of the governing statute. In support of this contention, NHT points to the fact that the number of permanent resident visas granted to transferred managers and executives has declined since the new definition was placed into effect.

NHT argues that this circumstance conflicts with the congressional intent to facilitate the interchange of managerial personnel between foreign companies and their domestic counterparts. NHT also asserts that the new March 1987 definition impermissibly burdens small firms lacking multi-tiered management structures. We cannot agree.

As a threshold matter, the INS is authorized to modify and change the definition of "managerial capacity." *See Valdez–Gaona v. Immigration and Naturalization Service*, 817 F.2d 1164, 1165–66 (5th Cir.1987); *Sussex Engineering, Ltd. v. Montgomery*, 825 F.2d 1084, 1089–90 (6th Cir.1987). Moreover, we are not persuaded that the later 1987 definition of "managerial capacity" applied by the INS frustrates the intent of Congress. An examination of the legislative history leading to the 1970 amendments to the Immigration and Naturalization Act (hereafter INA) and the 1987 regulations promulgated by the INS does not bear out NHT's contentions in that regard.

In 1965, the INA was amended to abolish a quota system which favored certain nations. In place of the old quota system, a new quota system was established which imposed an across-the-board 20,000 per country limit on visas, and further limited the total number of legal immigrants to 270,000. Thus, many Western Hemisphere businesses that formerly had been able to send virtually unlimited numbers of managerial executives to the United States were faced with substantial delays while visas were obtained.

This problem was addressed in 1970 when the INA was again amended by Congress. The 1970 amendment, which added the current "L" definition to the INA,[4] attempted to ease immigration restrictions occasioned by the 1965 amendment. According to the House sponsor of the bill, the legislation was designed to facilitate the temporary admission into the United States of executive, managerial, and spe-

---

4. 8 U.S.C. § 1101(a)(15)(L).

cialist personnel of international organizations. *See* 116 *Cong. Rec.*, 5730 (1970).

During floor debates on the bill, it was stressed that the class of applicants eligible for such visas would be small and carefully monitored by the INS; the proposed amendment would not provide a "back door" for aliens who would ultimately stay permanently in the United States. Instead, according to the Committee Report on the proposed amendment, the amendment would "help eliminate problems now faced by American companies having officers abroad in transferring key personnel freely within the organization." H.Rep. No. 851, 91st Cong., 1970 *U.S. Code Cong. & Admin. News* 2750, 2754. Accordingly, we do not conclude that the later 1987 definition of "managerial capacity," even if more narrowly drawn than the earlier 1983 definition, offends the intent of Congress to provide an escape valve for restrictive immigration quotas.

■ NHT also contends that the denial of NHT's visa application on behalf of Chang was arbitrary, capricious, and an abuse of discretion. More specifically, NHT argues that the INS abused its discretion in denying Chang's permanent visa when the INS had already accepted Chang's status as a manager for the purpose of granting him a temporary L–1 visa. In support of this argument, NHT points to a January 1989 memo from the INS Commissioner for Adjudication to all field officers, instructing that a sixth preference visa should not be denied to an L–1 visa holder absent a determination that the original visa was granted in error or that the circumstances of employment had changed since the original decision. This memo, however, was not issued until after the district court upheld both administrative denials. Moreover, NHT's argument on this issue would seem to require the INS to

be bound by its initial determination that an employee is a manager for purposes of granting a temporary visa when an application for a permanent visa is filed. We are convinced that such a result was not intended by Congress.

NHT next urges that the INS abused its discretion in applying the more stringent new definition of "managerial capacity" to Chang's visa petition when the regulation providing that new definition did not go into effect until two months after Chang's visa was denied. In sole support of this contention, NHT points to the fact that the original denial was, at least in part, based on the fact that Chang's managerial duties did not represent a "preponderance" of his services to NHT. NHT argues that by using the word "preponderance," the INS was obviously applying the "primarily direct[ ]" standard of the 1987 definition of "managerial capacity." We are unable to conclude that that circumstance alone compels the determination that the INS was applying the 1987 regulation rather than the 1983 regulation in denying Chang's visa. Moreover, because the original denial quotes in its entirety the 1983 definition of "managerial capacity," we are persuaded that the INS' "preponderance" requirement was merely a reasonable interpretation of the 1983 definition by the INS.[5] Accordingly, this argument of NHT is without merit.

■ The critical point in this case is that there was a significant failure to make a factual showing that Chang himself was "primarily" a manager. Instead, the factual evidence shows that Chang spent most of his time "performing audits", not directing others in the preparation of audits. His job description included

... testing validity and accuracy of financial data throughout all ledgers, financial reporting and shareholder report-

**5.** Since the NHT accounting unit to which Chang was assigned was relatively small, we hasten to emphasize that our holding is based on the conclusion that Chang was not primarily performing managerial duties; our decision does not rest on the size of Chang's accounting unit. The notion that a relatively large organization can have managerial employees who comply with the regulation, while a small company, with a managerial employee (or employees) discharging virtually identical duties, cannot, finds no support in the statute. Instead, we affirm on the ground that NHT did not carry its burden of proof because it failed to show that Chang engaged "primarily" in managerial activities.

ing. Assists comptroller in preparation of monthly shareholder reports. Verify all accounts payable voucher systems and expense reports and compare budgets against actual figures. Verify monthly employee payroll figures and test for accuracy.

The evidence shows that Chang himself did much of the work in preparing these various reports and in engaging in these various activities. The employees under him helped him make the reports, but did not themselves develop and make such reports. Thus, it is clear from the facts that the evidence in this case did not establish that Chang was engaged "primarily" in managerial activities. Instead, he was engaging in production activities himself. As such, the decision of the district court is correct and is properly affirmed.

Finally, NHT argues that the INS acted arbitrarily and abused its discretion in applying the 1983 definition of "managerial capacity" to the original denial of the visa and the later 1987 definition of "managerial capacity" to subsequent appeals. This contention is likewise without merit as NHT's visa application on behalf of Chang was denied under both standards. Accordingly, any error attributable to the INS' misapplication of the 1987 definition during appellate review was harmless.

## III. CONCLUSION

We conclude that the INS did not abuse its discretion by adopting a new definition of "managerial capacity" and denying NHT's application for a permanent resident visa for Chang. Accordingly, the judgment of the district court granting summary judgment in favor of the INS is affirmed.

AFFIRMED.