REPUBLIC OF TRANSKEI, et al., Appellants

v.

IMMIGRATION AND NATURALIZATION SERVICE.

No. 89–5357.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 26, 1990.

Decided Jan. 8, 1991.

Martin B. Danziger, with whom Mary C. Mulrean, Washington, D.C., was on the brief, for appellants.

Susan A. Nellor, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellee.

Before WALD, Chief Judge, WILLIAMS and THOMAS, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

Dissenting Opinion filed by Circuit Judge WILLIAMS.

WALD, Chief Judge:

The Washington Bureau of the Republic of Transkei ("Bureau") appeals from a district court ruling affirming the denial of the Bureau's "L–1" visa petition by the Immigration and Naturalization Service ("INS"). Because we find that the INS' denial was not arbitrary and capricious, we affirm the decision of the district court.

## I. BACKGROUND

The Republic of Transkei is one of the "homelands" created by the Republic of South Africa; it is not recognized by the United States or most other countries as a sovereign nation. Transkei has, however, established the Washington Bureau, a small non-profit corporation which disseminates trade, tourism, and political information and which encourages investment in and trade with Transkei.

Chief Jeremiah Moshoeshoe has served for more than twenty-five years in various cabinet positions in the Transkei government. In 1987, the government of Transkei appointed Chief Moshoeshoe, then Consul General of the Transkei Consulate in Durban, South Africa, to be President of the Washington Bureau.

The Bureau then filed a petition with the INS to change Moshoeshoe's (and his family's) nonimmigrant classification from B–1 (a visitor status) to L–1 (an "intra-company transferee" status). After requesting and receiving additional information, the Acting Director of the INS' Eastern Regional Service Center denied the petition. The Bureau appealed, and the INS' Administrative Appeals Unit ("AAU") affirmed the Director's decision, ruling, in part, that the Bureau had "not established [that] the beneficiary's duties in the United States will be primarily executive or managerial in nature."

Pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, the Bureau sought judicial review in the District Court for the District of Columbia. On cross-motions for summary judgment, the district court ruled in favor of the INS. The Bureau appeals.

## II. ANALYSIS

### A. *The Relevant Statute and Regulations*

The Immigration and Nationality Act and INS regulations define an "intra-company transferee" as

an alien who, immediately preceding the time of his/her application ... has been employed abroad continuously for the immediate prior year by a ... legal entity ... and who seeks to enter the United States temporarily in order to continue to render his/her services to ... the same employer ... in a capacity that is managerial, executive, or involves specialized knowledge.

8 C.F.R. § 214.2(*l*)(1)(ii)(A); *see also* 8 U.S.C. § 1101(a)(15)(L). The Director ruled, and the AAU affirmed, that the Bureau had failed to establish that Moshoeshoe both had been and would be employed in a "managerial" or "executive" capacity.[1] INS regulations define those terms as follows:

"Managerial capacity" means an assignment ... in which the employee *primarily* directs the organization ..., supervises and controls the work of other supervisory, professional or managerial employees, has the authority to hire and fire or recommend those as well as other personnel actions ..., and exercises discretionary authority over day-to-day operations. The term ... does not include a first-line supervisor unless the employees supervised are professional, nor does it include an employee who primarily performs the tasks necessary to produce the product and/or to provide the service(s) of the organization....

"Executive capacity" means an assignment ... in which the employee *primarily* directs the management of an organization ..., establishes the goals and policies of the organization ..., exercises wide latitude in discretionary decision-making, and receives only general supervision or direction....

8 C.F.R. § 214.2(*l*)(1)(ii)(B)–(C) (emphasis supplied).

### B. *The Decisions of the Director and the AAU*

Our review of the INS' application of these definitions to the Bureau's petition

---

**1.** The Bureau concedes that, under the current interpretation of INS regulations, Moshoeshoe does not qualify for an L–1 visa under the "specialized knowledge" provision. Memorandum Opinion ("Mem. op.") at 5.

for Moshoeshoe's reclassification is limited. We may vacate the INS' decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). More precisely, this court will examine the administrative record to ensure that the agency's decision "was based on a consideration of the relevant factors" and that the decision was not "a clear error." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *see Richards v. Immigration & Naturalization Service,* 554 F.2d 1173, 1177 (D.C.Cir.1977).

 Upon such review, we find that the Director and the AAU clearly considered the relevant factors. Affirming the Director, the AAU found three deficiencies in the Bureau's petition. First, the AAU ruled that the Bureau had submitted insufficient evidence to demonstrate that Moshoeshoe's earlier position as Consul General was primarily executive or managerial in nature.[2] Although the Bureau submitted many letters and documents attesting to Moshoeshoe's accomplishments as Consul General, the AAU found that the statute and regulations required more precise evidence concerning Moshoeshoe's authority as Consul General. In particular, the AAU noted, the Bureau had not specified the names or specific duties of persons supervised by Moshoeshoe as Consul General; as a result, the Director could not determine if Moshoeshoe served as more than a "first-line supervisor" as required by the regulations.

Second, the AAU also found that the Bureau had failed to establish that Moshoeshoe's duties in the Washington office would be *primarily* executive or managerial.[3] In support of its petition, the Bureau provided letters from high government officials stating that Moshoeshoe would "manage and direct the entire operation of the Washington Bureau" and "have ultimate decision making authority ... [and] control of the budget which exceeds $550,000." However, as the AAU noted, the record also reflected that Moshoeshoe would have *non*-managerial/*non*-executive duties—duties, in the words of the regulation, "necessary to ... provide the service(s) of the organization"; these include "direct[ing] the preparation of and presentation of all cultural, economic and trade information" and "initiat[ing] and maintain[ing] contacts with international organizations and foreign governments." Accordingly, the AAU affirmed the denial of the Bureau's petition because the Bureau failed to document what proportion of Moshoeshoe's duties would be managerial/executive functions and what proportion would be non-managerial/non-executive. *Cf. National Hand Tool Corp. v. Pasquarell,* 889 F.2d 1472 (5th Cir.1989) (affirming denial of visa petition because employee was not primarily engaged in managerial activities).

The agency's decision in this regard is wholly consistent with its position that persons whose duties include executive-level public relations and lobbying will not be disqualified from obtaining L–1 status simply because of those activities.[4] In order to apply that policy to a corporation whose *very business* is public relations and lobbying, the INS must distinguish between lobbying that is the business of the organization and lobbying that is "normally done

---

2. Moshoeshoe's duties as Consul General in Durban are relevant to the reclassification petition because INS regulations require a petitioner to file with its petition

> [e]vidence that the alien's prior year of employment abroad was in a position that was managerial, executive, or involved specialized knowledge and that the alien's prior education, training, and employment qualifies him/her to perform the intended services in the United States....

8 C.F.R. § 214.2(*l*)(3)(iv).

3. Initially the INS proposed regulations that defined "managerial" and "executive" capacity to require that *"virtually all* of the employee's time [ ] be spent in performing managerial or executive duties." 51 Fed.Reg. at 18,591, 18,592 (1986) (emphasis supplied). After receiving numerous comments criticizing this requirement, the INS promulgated final regulations requiring only that the employee's duties be *primarily* managerial or executive. *See* 52 Fed.Reg. at 5,738–39 (1987).

4. *See* note 6 *infra.*

by" top managers and executives. 51 Fed. Reg. at 5,739. Thus, contrary to the implication of the dissent, lobbying duties *may* disqualify an L–1 applicant, *if* those duties are not at an executive level.[5] In this case, the record indicates precisely that: at least some of Moshoeshoe's public relations and lobbying duties are not at an executive level. The Bureau functions as an embassy, and Moshoeshoe functions as an ambassador; embassies and ambassadors provide diplomatic services, including tasks such as attracting foreign investment and negotiating trade agreements. When Moshoeshoe conducts these activities, he is engaged *both* in public relations and lobbying *and* in providing the services for which the Bureau was established.[6] Although his responsibility for such nonexecutive duties does not necessarily doom Moshoeshoe's L–1 application, it does place on him the burden of documenting what proportion of his duties would be nonexecutive. The INS found that, in the application materials before it, Moshoeshoe failed to do so.

Finally, the AAU stated that the Bureau had failed to demonstrate that the Washington office, which has a total staff of four, "requires full-time executive or managerial direction." The AAU indicated that the fact that there were one or two executive-managerial staff in the office did not conclusively establish that Moshoeshoe's duties, as President of the office, would *primarily* be executive or managerial. The Bureau, the AAU emphasized, retained

the burden of proving that an organization of its small "size and scope requires an employee whose duties are executive and managerial to the exclusion of most ... other duties." Thus, from our review of the administrative·record, it is clear that the INS, in ruling on the Bureau's petition, has considered the relevant factors required by statute and regulation.

■ The Bureau also contends that denial of its petition constituted clear error. We do not agree. The Bureau presented a substantial amount of information documenting Moshoeshoe's duties in Washington. Much of the information indicated managerial and executive authority; however, much of the evidence also suggested that Moshoeshoe would, in the words of the district court, "*conduct* the business of the Washington Bureau as well as oversee it." Mem. op. at 10 (emphasis in original). For example, a letter from the President of Transkei stated that "while managing the operations of the Bureau" Moshoeshoe would also "undertake the task of disseminating cultural and economic information on Transkei, developing trade and investment opportunities ... and advancing the cause for international recognition." Based on this mix of information, it was not clearly erroneous for the INS to rule that the Bureau had not provided sufficient information that Moshoeshoe would be *primarily* charged with managerial and executive duties.[7]

> It was the Service's intention to include in the duties of a manager or executive activities that are normally done by persons in these positions, such as customer and public relations and lobbying and contracting.

51 Fed.Reg. at 5,739. As the dissent indicates, this language, taken alone, is somewhat ambiguous. In this case, however, the AAU can hardly be faulted for avoiding this ambiguity. Regardless of how the agency treats public relations and lobbying generally, such activities are plainly nonmanagerial and nonexecutive insofar as they are deemed necessary, as they must be in this case, to provide the services of the organization.

**7.** The Bureau also contends that the trial court applied an erroneous legal standard. As the Bureau notes, the trial court stated that Moshoeshoe "will not be *exclusively* engaged in executive and managerial tasks." Mem. op. at 10

---

**5.** We agree with our dissenting colleague that Congress intended L–1 status to "reach[ ] intercorporate transfers as well as intracorporate ones." *Post* at 181. We only note that when the primary purpose of an organization is public relations and lobbying, it makes no sense for all such activity to be considered "executive" or "managerial." Under the dissent's reasoning, it appears that if a large foreign widget manufacturer maintained a U.S. subsidiary staffed by fifty lobbyists, all fifty would be eligible for L–1 status, because none of the lobbyists performed tasks necessary to widget manufacturing and their remaining duties were "direct executive functions." Clearly this cannot be so. In such a situation, some lobbying must be executive, and some nonexecutive; and in·evaluating an L–1 application, the INS must distinguish between these.

**6.** In introducing its final revised L–1 regulations, the agency noted:

Although the INS regulations may appear to some as narrow or unduly burdensome, and their application as overly formalistic, our review of the agency's decision—as we have noted—is limited. The Supreme Court has reminded us that "[e]nforcing the immigration laws ... is becoming more difficult.... [T]he INS is the agency primarily charged by Congress to implement the public policy underlying these laws.... Appropriate deference must be accorded its decisions." *Immigration and Naturalization Service v. Miranda*, 459 U.S. 14, 19, 103 S.Ct. 281, 283–84, 74 L.Ed.2d 12 (1982). Under these circumstances, we find that the denial of the Bureau's petition was neither arbitrary and capricious nor clearly erroneous. Accordingly, we affirm the district court's decision.

WILLIAMS, *Circuit Judge,* dissenting:

The Republic of Transkei is an unrecognized pariah state within the Republic of South Africa. To advance its diplomatic and commercial interests in the United States, it formed a non-profit corporation, the Republic of Transkei Washington Bureau, now headed by Chief Jeremiah Moshoeshoe. It applied to the Immigration and Naturalization Service to issue the Chief an L–1 visa, which is available for executives or managers whose firms transfer them to the United States. 8 U.S.C. § 1101(a)(15)(L). Despite the seemingly executive or managerial character of all the duties Chief Moshoeshoe performs as Transkei's quasi-ambassador,[1] the INS has denied the petition, with no explanation intelligible to me. I would reverse and remand.

The INS's decision here appears almost impossible to square with its preambular explanation of its regulations (set forth in the majority opinion at 176–177) defining "managerial" and "executive" capacity. Two portions of that explanation must be reconciled. On the one hand, the agency excluded certain activities from qualifying as executive or managerial:

> In addition, *individuals who primarily perform the tasks necessary to produce the product(s) or provide the service(s) of an organization are not employed in an executive or managerial capacity....* The test is basic, [sic] to ensure that a person not only has requisite authority, but that a majority of his or her duties relate to operational or policy management, not to the supervision of lower level employees, performance of the duties of another type of position, or other involvement in the operational activities of the company, such as doing sales work or operating machines, or supervising those that do. This does not mean that the executive or manager cannot regularly apply his or her technical expertise to a particular problem.

52 Fed.Reg. 5738, 5739/1–2 (1987) (emphasis added).

On its face the emphasized language destroys the statute, limiting its availability to those whose role is purely decorative. The succeeding sentences, however, with their reference to those who operate machines or supervise people who do, indicate that the author was merely concerned to limit L–1 availability to the higher ranks. Another passage confirms that construction, identifying a specific class of duties that the INS viewed as executive or managerial:

> It was the Service's intention to *include* in the duties of a manager or executive *activities that are normally done by persons in these positions, such as cus-*

(emphasis supplied). The Bureau's claim, however, turns on a misreading of the opinion. In the quoted passage, the trial court was not articulating the relevant legal standard, but rather responding to the Bureau's claim that Moshoeshoe would "spend *all* of his time overseeing" Bureau activities. Mem. op. at 9 (emphasis supplied). It was in the context of rejecting that claim that the district court stated that Moshoeshoe would "not be exclusively engaged" in

managerial or executive work. Moreover, elsewhere in the opinion, the district court correctly stated the governing statutes, regulations, and burden of proof.

1. Chief Moshoeshoe was transferred here from Durban, where he performed quite similar duties under the title of Consul General. See Administrative Record at 32, 61.

*tomer and public relations and lobbying and contracting.*

*Id.* at 5739/1 (emphasis added).

As head of the Washington Bureau, the Chief lobbies, conducts trade negotiations, lures investments, studies trade potential, prepares reports on development of trade policy—and supervises others who do so. Letter of January 15, 1988, Administrative Record at 33, 34. He controls the Bureau's $550,000 budget, has ultimate decisionmaking authority with respect to all issues, and has authority to hire and fire members of the Bureau's understandably small staff (four or five persons). *Id.*

In finding that his duties were neither managerial nor executive, the INS parroted the exclusionary language quoted above:

> Similarly, the petitioner has not established the beneficiary's duties in the United States will be primarily executive or managerial in nature. Several of the duties enumerated by counsel on appeal are clearly *tasks necessary to provide the service of the organization.* Among these are: "direct the preparation of and presentation of all cultural, economic, and trade information disseminated by the Washington Bureau," "supervise the conduct and strategy of meetings between Washington Bureau officials and representatives of foreign governments and international organizations," and "initiate and maintain contacts with international organizations and foreign governments."

INS Decision at 2 (emphasis added). But it omitted any reference to the language that classifies as "executive" those activities that a firm head would commonly perform directly with outside parties, such as lobbying and developing valuable contacts. And it evidently assumed a literal reading of the phrase "necessary to ... provide the service(s)", a reading that completely torpedoes the statute.

Thus, although Chief Moshoeshoe's activities appear to consist entirely of (1) supervising staff who are engaged in professional activities, and (2) performing direct executive functions, the agency denied the visa by invoking the literal reading of its exclu-sive language and by ignoring its inclusion of direct executive functions.

I can imagine several possible constructions of the INS's regulatory preamble. The most obvious is that the inclusive language recognizes that real executives spend a good deal of their time not supervising others but actually *being* the representative of their firm. Accordingly, while a purported executive who spent his time working a lathe or collecting bills would properly fall under the INS's exclusion of those who "perform the tasks necessary to produce the product(s) or provide the service(s) of an organization", an executive who spent his time in "customer and public relations and lobbying and contracting", or "such" activities, would be eligible. The inclusive language, in other words, would thus shore up the non-literalist reading of the "necessary to ... provide the service(s)" phrase, limiting its exclusive effect to the lower echelons. This would comport with the ordinary understanding that specific language controls general. Under this reading, it seems inescapable that Chief Moshoeshoe is an executive.

A second reading is that although the inclusive language says that such activities as lobbying are included among executive duties, it means only that their performance does not count against eligibility. On such a view, one would look at all of a person's activities other than these and determine whether his or her remaining duties were "primarily" executive or managerial. Counsel for the agency appeared to press this view at oral argument, though the INS's written decision in the matter contains not a hint of it. See *SEC v. Chenery Corp.*, 318 U.S. 80, 92, 63 S.Ct. 454, 461, 87 L.Ed. 626 (1943). Under this reading it seems equally inescapable that Chief Moshoeshoe qualifies, as removal of his direct executive functions seems to leave only fairly high-level supervisory ones—*not* the excluded sort of "supervision of lower level employees" such as lathe operators or bill collectors. At least the INS decision does not identify any ac-

tivity of Chief Moshoeshoe that it views as neither "lobbying", etc., nor as high-level executive supervision. Moreover, the INS itself found that at least some of the Chief's subordinates were themselves "executive/managerial employees", INS Decision at 2; it is unclear how one who supervises such workers could fail to be "executive/managerial" himself.

A third possibility is that the INS has simply thought better of its inclusive language on lobbying, etc. It might have come to believe that even though real executives perform those functions, it is free to read Congress's instructions as permitting it to withhold the L–1 visa from all but classic managers of personnel. This view would seem to undo Congress's use of the word "executive", but might conceivably be permissible under *Chevron U.S.A. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

A fourth reading, offered by the majority, is that the inclusive treatment of direct executive functions does not "apply to a corporation whose *very business* is public relations and lobbying." See Maj. Op. at 178. The first difficulty with this is that it assumes a literal meaning for the "necessary to ... provide the service(s)" phrase, thereby confining the statute's benefits to executive or managerial drones.

Even if we surmount that hurdle, the majority reading is in tension with the general purpose of the statute and regulations to permit transfers within an entire corporate family without regard to the assignment of tasks as between parent and subsidiary.[2] Absent that focus on the overall entity, in fact, Chief Moshoeshoe would be completely ineligible, as Transkei's Washington Bureau is a different legal entity from Transkei itself. But the statute reaches intercorporate transfers as well as intracorporate ones, and the INS extends this embracing attitude to government corporations and even to non-corporate ecclesiastical institutions.[3] It seems natural to extend that attitude to the word "organization" in the phrase rejecting executive status for an employee who performs tasks "necessary ... to provide the service(s) of the organization". If instead one construes it narrowly, the L–1 visa will be unavailable to the executives of any small US subsidiary that performs primarily high-level duties for a larger corporate complex, seemingly the opposite of the commonsensical reading of the phrase. On the broad reading, there is no problem for Chief Moshoeshoe, as the business of the Republic of Transkei is plainly far broader than lobbying and trade promotion. In any event, because the INS appears never to have dreamed of the majority's theory, it offered no interpretation of "organization" (except insofar as a view may be implicit in the outcome here), and certainly no explanation of its view.[4]

---

**2.** The controlling statute, 8 U.S.C. § 1101(a)(15)(L), authorizes a visa for:

(L) an alien who, immediately preceding the time of his application for admission into the United States, has been employed continuously for one year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge, and the alien spouse and minor children of any such alien if accompanying him or following to join him.

See also 8 CFR § 214.2(1)(ii)(A) (1990) (definition of intracompany transferee).

**3.** The Service regards the Delaware subsidiary of a Hungarian government corporation as adequately affiliated for L–1 purposes, *Matter of Barsai*, 18 I. & N. Dec. 13, 1981 BIA Lexis 10 (Regional Commissioner), and would evidently find the necessary affiliation even for a Delaware corporation owned directly by the Hungarian government, see *id.* at 14. More generally, where stock ownership is absent, the agency looks to control relationships. See *Matter of Church [of] Scientology*, Interim Decision # 3052, 1988 BIA Lexis 12 (Commissioner).

**4.** Of course, once we recognize that lobbyists in a primarily lobbying organization (e.g., the Washington Bureau) can qualify for the L–1 visa, see Maj. Op. at 178 n. 5, the chief lobbyist in that organization would surely deserve the title, especially if his underlings themselves are "executives" or "managers", see p. 181 above.

In fact the INS has not offered *any* reading that would harmonize the two strains in its explanation of its L–1 visa regulations. Thus it has maximized its freedom of maneuver. It can hop from case to case, offering each applicant as little explanation as it accorded this one, and deciding each case on whatever notion may catch its fancy. This is reasoned decisionmaking?

The INS's call for more facts adds nothing. As Holmes liked to say, "A fact taken in its isolation ... is gossip." 1 Holmes–Laski Letters 129 (1953). Without some coherent interpretation by the INS of its own prior statements, it is impossible to tell how additional facts might alter the picture; there is no point in an applicant's shovelling facts at the agency if it declines to reveal by what principle it will assess them.

As the majority regards the agency's conduct here as quite consistent with the Administrative Procedure Act's ban on arbitrary or capricious actions, 5 U.S.C. § 706, it appears that no judicially enforced law requires the INS to develop a coherent view of the language by which it once explained these regulations. This dissent can only raise the interpretive issue; some conscientious INS officer will perhaps consider it and thereby edge the agency toward the rule of law.