# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 1, 2014    Decided October 21, 2014

No. 13-5301

FOGO DE CHAO (HOLDINGS) INC.,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET
AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01024)

———

*Carl W. Hampe* argued the cause for appellant. With him
on the brief was *Steve Chasin*.

*Gisela A. Westwater*, Senior Litigation Counsel, U.S.
Department of Justice, argued the cause for appellees. With
her on the brief were *Stuart F. Delery*, Assistant Attorney
General, and *Aram A. Gavoor*, Trial Attorney. *R. Craig
Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: KAVANAUGH, MILLETT and WILKINS, *Circuit
Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

MILLETT, *Circuit Judge*: Fogo de Chao (Holdings), Inc., operates numerous Brazilian steakhouse restaurants, known as *churrascarias*, in Brazil and the United States. According to Fogo de Chao, a critical component of its success has been the employment in each of its restaurants of genuine gaucho chefs, known as *churrasqueiros*, who have been raised and trained in the particular culinary and festive traditions of traditional barbecues in the Rio Grande do Sul area of Southern Brazil.

But of late, Fogo de Chao's efforts to bring authentic Brazilian *churrasqueiro* chefs into its United States restaurants have hit a legal roadblock. Federal immigration law provides what are known as L-1B visas to qualifying multinational businesses, which permit them to temporarily transfer foreign employees possessing "specialized knowledge" into the United States. From 1997 to 2006, the Department of Homeland Security granted Fogo de Chao over 200 L-1B visas for its *churrasqueiros*. In 2010, Fogo de Chao sought to transfer another *churrasqueiro* chef, Rones Gasparetto, to the United States, reasoning that his distinctive cultural background and extensive experience cooking and serving meals in the *churrasco* style constitute "specialized knowledge." The Administrative Appeals Office within the Department of Homeland Security concluded, however, that Gasparetto's cultural background, knowledge, and training could not, as a matter of law, constitute specialized knowledge. Unable to discern either (i) a sufficiently reasoned path in the Appeals Office's strict bar against culturally based skills, or (ii) substantial evidence supporting its factual finding that Gasparetto did not complete the company training program, we reverse and remand the district court's grant of summary judgment to the government.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

**1.** In 1970, Congress amended the Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.*, to create a nonimmigrant visa program for qualifying employees of multinational companies that are being transferred to the United States. *See* Pub. L. No. 91-225, 84 Stat. 116, 116 (1970). As amended, the Act provides that a temporary, nonimmigrant visa may be issued to an alien who, after being employed continuously by the sponsoring employer for at least one year in the three years preceding his or her application, seeks to enter the United States to continue working for that employer (or an affiliate) "in a capacity that is managerial, executive, or involves specialized knowledge[.]" 8 U.S.C. § 1101(a)(15)(L).[1] A visa granted to an employee whose work entails specialized knowledge is commonly referred to as an L-1B visa, while a visa for managerial or executive employees is known as an L-1A visa. The "specialized knowledge" L-1B visa is at issue in this case.

The 1970 Act did not define "specialized knowledge," and the term has been subject to varying regulatory

---

[1] The statutory provision, in relevant part, defines a "nonimmigrant alien[]" eligible for a visa as "an alien who, within 3 years preceding the time of his application for admission into the United States, has been employed continuously for one year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge[.]" 8 U.S.C. § 1101(a)(15)(L).

4

definitions. By 1987, the formal regulatory definition of "specialized knowledge" was "knowledge possessed by an individual whose advanced level of expertise and proprietary knowledge of the organization's product, service, research, equipment, techniques, management, or other interests of the employer are not readily available in the United States labor market." 52 Fed. Reg. 5738, 5752 (Feb. 26, 1987) (codified at 8 C.F.R. § 214.2(*l*)(1)(ii)(D) (1988)).

In 1990, Congress displaced that regulation with its own statutory definition, providing that an employee has specialized knowledge "if the alien has a special knowledge of the company product and its application in international markets or has an advanced level of knowledge of processes and procedures of the company." 8 U.S.C. § 1184(c)(2)(B); *see also* Immigration Act of 1990, Pub. L. No. 101-649, § 206(b)(2)(B), 104 Stat. 4978, 5023.

The Immigration and Naturalization Service has since promulgated a regulatory definition of "specialized knowledge" that essentially tracks the new statutory language, defining it as "special knowledge possessed by an individual of the petitioning organization's product, service, research, equipment, techniques, management, or other interests and its application in international markets, or an advanced level of knowledge or expertise in the organization's processes and procedures." 8 C.F.R. § 214.2(*l*)(1)(ii)(D).[2]

---

[2] The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, abolished the Immigration and Naturalization Service and transferred its authority to the Secretary of Homeland Security and two divisions within the Department of Homeland Security: the Bureau of Immigration and Customs Enforcement and the

**2.** Under the current regulations, a company seeking to classify an alien as eligible for an L-1B visa must file a petition with the Secretary. 8 C.F.R. § 214.2(*l*)(2)(i). Included with the petition must be:

> (ii) Evidence that the alien will be employed in [a] * * * specialized knowledge capacity, including a detailed description of the services to be performed[;]
>
> (iii) Evidence that the alien has at least one continuous year of full-time employment abroad with a qualifying organization within the three years preceding the filing of the petition[; and]
>
> (iv) Evidence that the alien's prior year of employment abroad was in a position that * * * involved specialized knowledge and that the alien's prior education, training, and employment qualifies him/her to perform the intended services in the United States; however, the work in the United States need not be the same work which the alien performed abroad.

*Id.* § 214.2(*l*)(3).

While no other regulatory definition of "specialized knowledge" has been promulgated, internal agency memoranda have provided additional guidance. Specifically, in March 1994, James Puleo, the Acting Executive Associate Commissioner of the Immigration and Naturalization Service, issued a memorandum elaborating on the proper interpretation of "specialized knowledge." The Puleo Memorandum counseled that common dictionary definitions of the key

Bureau of Citizenship and Immigration Services. *See Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

terms "special" and "advanced" should be used. "Special" thus signifies "surpassing the usual; distinct among others of a kind" or "distinguished by some unusual quality; uncommon; noteworthy." Memorandum of James A. Puleo, Acting Executive Assoc. Comm'r, Immigration and Naturalization Service, *Interpretation of Special Knowledge* at 1 (March 9, 1994), *reproduced in* J.A. 42 (quoting WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY and WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY). While an employee's knowledge need not be proprietary or unique, the Puleo Memorandum explained, the knowledge must still be different or uncommon and not generally found in the particular industry. *Id.* Knowledge might be found to be special where, for example, "[t]he alien beneficiary has knowledge of a foreign firm's business procedures or methods of operation" such that "the United States firm would experience a significant interruption of business in order to train a United States worker to assume those duties." *Id.* at 2, J.A. 43.[3]

In 2004, Fujie Ohata, the Director of Service Center Operations for United States Citizenship and Immigration Services ("the Service"), issued another memorandum providing guidance on whether and when chefs' or specialty cooks' skills would qualify as "specialized knowledge." Memorandum of Fujie O. Ohata, Director, Service Center Operations, United States Citizenship and Immigration Services, *Interpretation of Specialized Knowledge for Chefs and Specialty Cooks Seeking L-1B Status* (Sept. 9, 2004),

---

[3] "Advanced" knowledge, in turn, signifies "highly developed or complex; at a higher level than others" or "beyond the elementary or introductory; greatly developed beyond the initial stage." Puleo Memorandum at 2, J.A. 43 (quoting WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY and WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY).

*reproduced in* J.A. 48–51. The Ohata Memorandum advised that "Chefs or Specialty Cooks generally are not considered to have 'specialized knowledge' for L-1B purposes." *Id*. at 1, J.A. 48. The relevant question, the Ohata Memorandum elaborated, is "not only how skilled the chef is and whether or not his or her skills are common to other chefs, but also the role the chef plays within the petitioning organization and the impact his or her services would have on the operations of the U.S.-based affiliate." *Id* at 2, J.A. 49. A chef's "ancillary" duties, such as singing in a themed restaurant, may also give rise to specialized knowledge. *Id*. The inquiry turns on an assessment of "the length and complexity of in-house training required to perform such duties" in order to determine "the amount of economic inconvenience, if any, the restaurant would undergo were it required to train another individual to perform the same duties." *Id.*

Echoing the Puleo Memorandum, Ohata stressed that, to qualify as "specialized knowledge" of the relevant product or process, the employee's skill "must be of the sort that is not generally found *in the particular industry*, although it need not be proprietary or unique." Ohata Memorandum at 2, J.A. 49. In that regard, "[r]ecipes and cooking techniques that can be learned by a chef through exposure to the recipe or cooking techniques for a brief or moderate period of time generally do not constitute specialized knowledge." *Id.* at 3, J.A. 50.

Ultimately, then, the petitioner's burden is to show through probative evidence that the proposed visa beneficiary's knowledge is "(a) uncommon or not generally shared by practitioners in the alien's field of endeavor; (b) not easily or rapidly acquired, but is gained from significant experience or in-house training, and (c) is necessary and

relevant to the successful conduct of the employer's operations." Ohata Memorandum at 4, J.A. 51.

## B. Factual Background

Fogo de Chao owns numerous upscale *churrascarias*, or Brazilian steakhouses, that focus on the *churrasco*, a traditional festive style of both preparing and serving meat derived from the gaucho culture of the Rio Grande do Sul region of southern Brazil. Following its success in Brazil, Fogo de Chao entered the United States market in 1997, and now has restaurants in sixteen cities here.

Fogo de Chao seeks to recreate for its customers an authentic *churrascaria* experience, and it does so by employing at each restaurant a certain number of Brazilian-born *churrasqueiros*, or "gaucho chefs," who learned the *churrasco* style of cooking and service firsthand both growing up in the Rio Grande do Sul region and through training and at least two years of experience in Fogo de Chao's Brazilian restaurants. Those *churrasqueiros* provide both direct customer service as chefs and train American employees to serve as *churrasqueiro* chefs. According to an affidavit filed by Fogo de Chao's Chief Executive Officer, only those native Brazilian *churrasqueiros*, who come with years of firsthand experience in the *churrasco* tradition and have survived Fogo de Chao's own selection process, have proven capable of performing all of the culinary and service-related duties that Fogo de Chao requires of its *churrasqueiro* chefs, notwithstanding the significant amount of training provided to the company's other employees. Fogo de Chao has thus petitioned hundreds of times before for L-1B "specialized knowledge" visas for its Brazilian *churrasqueiros* to transfer to its U.S. restaurants. Over 200 of those petitions were granted prior to the petition at issue here.

The present appeal arises out of Fogo de Chao's application in January 2010 for an L-1B visa for Rones Gasparetto, a Brazilian *churrasqueiro*. Fogo de Chao filed with that petition a cover letter, signed by the company's Chief Executive Officer, declaring that Gasparetto had been employed as a "*Churrasqueiro* Chef" in Sao Paulo, Brazil since May 1, 2007, and had worked in the same capacity in another of Fogo de Chao's Brazilian affiliates from June 2006 through February 2007. The letter outlined the exacting selection process by which Gasparetto had been chosen to enter Fogo de Chao's *churrasqueiro* training program, his successful completion of that program, and the various duties relating to food preparation and service that he was able to perform as a result of both that training and his rural upbringing participating in the *churrasco* tradition in southern Brazil. Fogo de Chao submitted a number of exhibits as well, including Gasparetto's passport, a year of his paystubs from a Fogo de Chao affiliate in Brazil, descriptions of Fogo de Chao's corporate structure and operations in the United States, and information, including several expert reports, discussing (i) the distinguishing features of Fogo de Chao's business model and training program, (ii) the *churrasco* method and the region of Brazil from which it is drawn, and (iii) the distinct skills required of the company's *churrasqueiro* chefs.

In February 2010, the Service issued a Request for Evidence seeking additional information on (1) Fogo de Chao's organizational structure, (2) the number of persons employed in Gasparetto's position at the restaurant in the United States to which Fogo de Chao sought to transfer him, (3) the manner in which his proposed duties had previously been performed in that restaurant, (4) the features distinguishing Gasparetto's duties and training from those of Fogo de Chao's other employees, (5) the nature of any

training he was to provide, and (6) the impact on Fogo de Chao's business if it could not transfer Gasparetto. Fogo de Chao responded by providing additional information.

Shortly thereafter, the Director of the Vermont Service Center denied Fogo de Chao's petition, finding that Gasparetto did not appear to be employed in a specialized-knowledge capacity. Acknowledging Fogo de Chao's claim that Gasparetto's position requires someone with experience growing up in the gaucho culture and the *churrasco* tradition of southern Brazil, the Director nonetheless concluded that the company had not shown "that these skills are so uncommon or complex that other chefs in the industry could not master them within a reasonable period of time." J.A. 390.

## C. Procedural History

**1.** Fogo de Chao filed a complaint in the United States District Court for the District of Columbia against the Service, the Department of Homeland Security, and other federal defendants (collectively, "the Department") challenging the denial of the petition. While the case was pending, the Service reopened the proceedings on its own motion in October 2010, and the district court stayed its proceedings.

In the reopened administrative case, Fogo de Chao submitted both a legal memorandum and additional exhibits, including an affidavit from Fogo de Chao's Chief Executive Officer further detailing the company's distinct business model, outlining the duties its *churrasqueiro* chefs must be able to perform, and explaining that the company thus far has been unable to teach non-Brazilian employees to successfully execute all of those skills. Specifically, of the seventeen duties required of Fogo de Chao's *churrasqueiros*, the affidavit indicated that four of the duties could not be taught

to non-Brazilian employees within a reasonable time and six could not be taught at all no matter how much training was given. Other documents submitted at this time included Gasparetto's *curriculum vitae*, a letter from a Brazilian nutritionist who had interviewed him and evaluated his ability to fill the *churrasqueiro* role, and additional information on the company's hiring process and the manner in which newly hired employees enter Fogo de Chao's training program.

The Vermont Service Center Director again denied the petition. The Director concluded that Fogo de Chao had not shown that its training program imparted specialized knowledge or that its methods differed from those of other Brazilian *churrascaria* restaurants in the United States. The Director also ruled that Fogo de Chao had failed to provide sufficient details about Gasparetto's work in Fogo de Chao's Brazilian restaurants, information on what distinguished his knowledge from that of Fogo de Chao's other employees, or sufficient evidence of his completion of Fogo de Chao's training program. The Director then certified his decision to the Service's Administrative Appeals Office as a case involving "an unusually complex or novel issue of law or fact." J.A. 571.

**2.** The Appeals Office affirmed the Director's decision. First, the Appeals Office concluded that the petition could be denied solely on the grounds that (i) Gasparetto's culinary skills, knowledge of his native regional culture, and "authenticity" gained through his life experiences could not, as a matter of law, constitute "special knowledge of the petitioner's product," J.A. 665, and (ii) Fogo de Chao failed to

establish that Gasparetto had completed two years of training and one year of employment as a *churrasqueiro* chef.[4]

Second, the Appeals Office concluded that Fogo de Chao had not established that the *churrasqueiro* position generally required specialized knowledge, relying again on its conclusion that knowledge of the culture and culinary traditions of the Rio Grande do Sul region of Brazil could not constitute specialized knowledge. The Appeals Office added that Fogo de Chao had also failed both to distinguish the knowledge and skills of its *churrasqueiros* from those of similar employees in the *churrascaria* industry and to demonstrate sufficiently that it could not train employees hired in the United States to perform that role.

**3.** Following the Appeals Office decision, proceedings before the district court resumed, and the district court subsequently granted the Department's motion for summary judgment. In so ruling, the district court deferred, under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), to what it viewed as the Appeals Office's regulatory interpretation of "specialized knowledge." *See Fogo De Chao Churrascaria, LLC v. Department of Homeland Security*, 959 F. Supp. 2d 32, 44–49 & n.5 (D.D.C. 2013). The court further concluded that the Appeals Office's determination that Fogo de Chao had failed to submit sufficient documentation regarding Gasparetto's completion of its training program rendered harmless any error the agency had committed in its treatment of Gasparetto's cultural knowledge. *Id.* at 46–47. Finally, the district court rejected Fogo de Chao's claims that the agency had impermissibly

---

[4] For those same reasons, the Appeals Office also found that Fogo de Chao had not demonstrated that Gasparetto had "advanced" knowledge that would qualify him for the L-1B visa.

departed from precedent without going through notice-and-comment rulemaking and had prejudged Fogo de Chao's petition. *Id.* at 49–51.

Fogo de Chao timely filed this appeal.

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*, applying the familiar Administrative Procedure Act standard that "requires us to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Jicarilla Apache Nation v. Department of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)); *see also, e.g.*, *Republic of Transkei v. INS*, 923 F.2d 175, 177 (D.C. Cir. 1991) (same). The scope of our review is narrow, and "a court is not to substitute its judgment for that of the agency." *Judulang v. Holder*, 132 S. Ct. 476, 483 (2011) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). Rather, we consider only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Judulang*, 132 S. Ct. at 484 (quoting *State Farm*, 463 U.S. at 43); *see also Republic of Transkei*, 923 F.2d at 177 (same).

We generally accord substantial deference to an agency's interpretation of both a statute it administers and its own implementing regulations. *See, e.g.*, *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (deference to statutory interpretation) (citing *Chevron*, 467 U.S. 837); *Decker v. Northwest Envtl. Defense Ctr.*, 133 S. Ct. 1326, 1337 (2013) (deference to regulatory interpretation unless it "is plainly erroneous or inconsistent with the regulation") (citations omitted).

No deference is due, however, to an agency's interpretation of its own regulation when, "instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.*, 709 F.3d 1, 18 (D.C. Cir. 2013) (quoting *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006)). Rather, where "the underlying regulation does little more than restate the terms of the statute itself[,]" the agency has left the statute as it found it, adding nothing material to Congress's language and providing nothing of its own in which to ground an interpretation to which a court might defer. *Gonzales*, 546 U.S. at 257 (citing *Auer v. Robbins*, 519 U.S. 452 (1997)).

That is what has happened here where the agency's "specialized knowledge" regulation mirrors the statutory text. The Immigration and Nationality Act defines "specialized knowledge" as "a special knowledge of the company product and its application in international markets or * * * an advanced level of knowledge of processes and procedures of the company." 8 U.S.C. § 1184(c)(2)(B). The regulation, in turn, recites that "specialized knowledge" means "*special knowledge* possessed by an individual of the petitioning organization's *product*, service, research, equipment, techniques, management, or other interests and *its application in international markets*, or an *advanced level of knowledge* or expertise in the organization's *processes and procedures*." 8 C.F.R. § 214.2(*l*)(1)(ii)(D) (emphases added). The regulation thus largely parrots, rather than interprets, the key statutory language.

To be sure, there are stray differences between the statutory and regulatory definitions. But that provides no basis for judicial deference because "[t]he Government does not suggest that its interpretation turns on any difference

between the statutory and regulatory language." *Gonzales*, 546 U.S. at 257. Instead, because the regulation "gives little or no instruction," *id.*, on the question at issue—what constitutes "special" or "advanced" knowledge for the purposes of L-1B visa eligibility—we cannot say that the agency has interpreted its regulation, rather than the underlying statute.

Nor does the Appeals Office's interpretation of the statutory language in a non-precedential ruling trigger *Chevron* deference, as the government's counsel openly conceded at oral argument, *see* Oral Arg. Tr. 25:13–20. *Cf. International Internship Program v. Napolitano*, 718 F.3d 986, 987 n.1 (D.C. Cir. 2013) (reserving that question).

There is no dispute in this case that Congress, in the Immigration and Nationality Act, has "delegated authority to the agency generally to make rules carrying the force of law." *United States v. Mead Corp.*, 533 U.S. 218, 226–227 (2001).[5]

---

[5] This deference point is uncontested and, in any event, would not be determinative of the *Chevron* inquiry here. Accordingly, we need not decide whether the shared statutory responsibility of the Attorney General and the components of the Department of Homeland Security in addressing legal questions relating to the adjudication of petitions for nonimmigrant visa classifications may preclude a finding that Congress has delegated such authority to the Department of Homeland Security or its components acting alone. *See* 8 U.S.C. § 1103(a)(1) (providing that, while the Secretary of Homeland Security is granted administrative and enforcement authority in connection with the laws relating to the immigration and naturalization of aliens, "determination and ruling by the Attorney General with respect to all questions of law shall be controlling"); 8 C.F.R. § 103.3(c) (providing roles for both the Secretary of Homeland Security and the Attorney General in designating Service decisions as precedents).

To trigger deference, however, the agency must also show "that the agency interpretation claiming deference was promulgated in the exercise of that authority," *Mead*, 533 U.S. at 227, which did not happen here. The Appeals Office decision, and any legal interpretations contained within it, were the product of informal adjudication within the Service, rather than a formal adjudication or notice-and-comment rulemaking. The absence of those "relatively formal administrative procedure[s]" that "tend[] to foster the fairness and deliberation that should underlie a pronouncement" of legal interpretation, *Mead*, 533 U.S. at 230, weighs against the application of *Chevron* deference, *see id.* at 230–231. Nor is the Appeals Office's decision marked by the qualities that might justify *Chevron* deference in the absence of a formal adjudication or notice-and-comment rulemaking. *See Barnhart v. Walton*, 535 U.S. 212, 222 (2002) (applying *Chevron* deference despite less formal rulemaking procedures because of "the careful consideration the Agency ha[d] given the question over a long period of time" and other factors); *Fox*, 684 F.3d at 77–78 (no deference to agency letter that failed to meet *Barnhart* criteria).

Moreover, the expressly non-precedential nature of the Appeals Office's decision conclusively confirms that the Department was not exercising through the Appeals Office any authority it had to make rules carrying the force of law. *Cf. Martinez v. Holder*, 740 F.3d 902, 909–910 (4th Cir. 2014), *as revised* (Jan. 27, 2014) (holding non-precedential opinions issued by one member of the Board of Immigration Appeals are not entitled to *Chevron* deference).[6] That is

---

[6] *See also Dhuka v. Holder*, 716 F.3d 149, 156 (5th Cir. 2013) (same conclusion for three-member Board of Immigration Appeals decisions not designated precedential); *Mei Juan Zheng v. Holder*, 672 F.3d 178, 184 (2d Cir. 2012) (same); *Arobelidze v. Holder*, 653

because the decision's "binding character as a ruling stops short of third parties" and is "conclusive only as between [the agency] itself and the [petitioner] to whom it was issued." *Mead*, 533 U.S. at 233; *see* 8 C.F.R. § 103.2(b)(16)(ii) ("A determination of statutory eligibility shall be based only on information contained in the record of proceeding which is disclosed to the applicant or petitioner[.]"); *id.* § 103.3(c) (designating specific procedure, not followed here, by which the Secretary of Homeland Security or designated officials within the department may, with the concurrence of the Attorney General, designate an Appeals Office decision as precedential).  Having disclaimed any intent to set a rule of law with any force beyond the petition at issue, the Appeals Office cannot—and tellingly does not—now claim to have promulgated its decision as an exercise of any authority it had to make such rules.

The unsuitability of the *Chevron* model of review does not mean that no deference is due, however.  The Department's interpretation of the statute is "'entitled to respect' * * * to the extent it has the 'power to persuade.'" *Gonzales*, 546 U.S. at 256 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  "The weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Id.* at 268 (quoting *Skidmore*, 323 U.S. at

F.3d 513, 520 (7th Cir. 2011) (no *Chevron* deference for non-precedential, single-member Board of Immigration Appeals decisions); *Carpio v. Holder*, 592 F.3d 1091, 1097 (10th Cir. 2010) (same); *Quinchia v. Attorney General*, 552 F.3d 1255, 1258 (11th Cir. 2008) (same); *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1012–1013 (9th Cir. 2006) (same).

140)). That, accordingly, is the standard of review that we apply in this case.[7]

### III. SUBJECT-MATTER JURISDICTION

Although neither party contests the subject-matter jurisdiction of this court or the court below, we are obligated to assure ourselves that such jurisdiction exists. *See Wagner v. FEC*, 717 F.3d 1007, 1009–1010 (D.C. Cir. 2013).

The petitioner here brought suit in the district court pursuant to 28 U.S.C. § 1331. This court has previously recognized that the general federal-question statute confers jurisdiction over a similar challenge brought under the Immigration and Nationality Act. *See Abourezk v. Reagan*, 785 F.2d 1043, 1050 (D.C. Cir. 1986) (Administrative Procedure Act challenge to the State Department's denial of visas to invited speakers). The question is whether that grant of jurisdiction was subsequently withdrawn by 8 U.S.C. § 1252(a)(2)(B)(ii), which provides that:

> Notwithstanding any other provision of law * * *, no court shall have jurisdiction to review * * * any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under [8 U.S.C. §§ 1151–1381] to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title [relating to asylum].

---

[7] Since Fogo de Chao does not challenge the interpretations of the "specialized knowledge" standard contained in the Puleo and Ohata memoranda, we need not consider what level of deference, if any, is due to those memoranda's legal interpretations.

We hold that the Appeals Office's denial of an L-1B visa request under 8 U.S.C. § 1184(c)(1) does not represent a "decision or action * * * the authority for which is specified * * * to be in the discretion of the Attorney General or the Secretary of Homeland Security," within the meaning of that jurisdictional bar. In *Kucana v. Holder*, 130 S. Ct. 827 (2010), the Supreme Court explained that Section 1252(a)(2)(B)(ii) "speaks of authority 'specified'—not merely assumed or contemplated—to be in the Attorney General's discretion," and "'[s]pecified' is not synonymous with 'implied' or 'anticipated,'" *id.* at 834 n.10. Instead, "'the language of the statute in question must provide the discretionary authority' before the bar can have any effect." *Soltane v. Department of Justice*, 381 F.3d 143, 146 (3d Cir. 2004) (Alito, J.) (quoting *Spencer Enterprises, Inc. v. United States*, 345 F.3d 683, 689 (9th Cir. 2003)).

Here, there is no such statutory grant of discretionary authority in connection with the Service's review of petitions for the L-1B visa classification. Congress nowhere textually assigned such judgments to the Secretary of Homeland Security's or the Attorney General's sole discretion. Instead, the statute mandates that visa determinations "*shall* be determined by the Attorney General * * * upon petition of the importing employer," 8 U.S.C. § 1184(c)(1) (emphasis added), and the criteria for such decisions are laid out in the statute, including specifically a definition of "specialized knowledge," *id.* § 1184(c)(2)(B). *See Soltane*, 381 F.3d at 147 (no jurisdictional bar because the relevant definition of "special immigrant" was "fairly detailed and specific, with no explicit reference to 'discretion'"); *Spencer Enterprises*, 345 F.3d at 691 (no jurisdictional bar to challenging a visa denial under the immigrant investor program because the statute "both mandates issuance of such visas and sets out a series of standards for eligibility that the visa petitioner must meet")

(citation omitted); *id.* (noting that 8 U.S.C. § 1153(b)(5)(A) provides that "[v]isas *shall* be made available * * * to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise").

In sum, because the relevant provision of the Immigration and Nationality Act does not commit the decision whether to grant an L-1B petition to the independent discretion of the Attorney General or the Secretary of Homeland Security, and because Congress legislated statutory criteria to be applied in deciding such petitions, the district court had jurisdiction to hear Fogo de Chao's challenge. This court, in turn, has jurisdiction to hear Fogo de Chao's timely appeal under 28 U.S.C. § 1291.

## IV. THE APPEALS OFFICE DECISION

Fogo de Chao raises numerous objections to both the legal standard applied by the Appeals Office and its application of the law to the facts in this record. With respect to Fogo de Chao's challenges to the legal standard, we agree that the Appeals Office erred in adopting a categorical prohibition on any and all culturally acquired knowledge supporting a "specialized knowledge" determination. We further agree that the Appeals Office's conclusion that Fogo de Chao had failed to establish that Gasparetto completed the company's training program is unsupported by substantial evidence. In light of those errors, it is not clear that the Appeals Office would have resolved other challenged aspects of its decision in the same fashion or would have found the other bases for the decision sufficient alone to warrant denial of Fogo de Chao's petition. Accordingly, consistent with our limited role in reviewing agency action, we reverse the district court's judgment and remand with instructions to vacate the Appeals Office's order and remand for further proceedings

consistent with this opinion. *See INS v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002) (applying the "ordinary remand" rule).

### A. The "Specialized Knowledge" Legal Standard

Fogo de Chao levels three distinct challenges to the Appeals Office's legal interpretation of the "specialized knowledge" test. We agree with Fogo de Chao that the agency's conclusion regarding the categorical irrelevance of culturally acquired knowledge was insufficiently reasoned to be sustained. We reject the remainder of Fogo de Chao's legal challenges on the current record.

#### 1. The Relevance of Knowledge and Skills Gained Through Culture to the "Specialized Knowledge" Test

In denying the Gasparetto visa, the Appeals Office concluded that "[t]he inherent knowledge a person gains as a result of his or her upbringing, family and community traditions, and overall assimilation to one's native culture necessarily falls into the realm of general knowledge, even if an individual's specific culture itself is limited to a relatively small population or geographic location." J.A. 663. Fogo de Chao challenges that categorical rule as unsupported by the Puleo and Ohata memoranda or any other previous administrative precedent and ungrounded in statutory text or purpose. We hold that the agency has not offered a reasoned analysis of why the statutory phrase "specialized knowledge" would woodenly debar any and all knowledge acquired through one's cultural traditions, upbringing, or "life experience," J.A. 662, or how that rule comports with the prior agency guidance that the Appeals Office purported to follow.

As an initial matter, nothing in the statute itself textually excludes all culturally acquired knowledge as a form of "specialized knowledge," 8 U.S.C. § 1184(c)(2)(B). In fact, cultural knowledge appears to fit naturally within the dictionary definitions that the Puleo Memorandum endorsed for construing the terms "special" and "advanced." Knowledge and skills associated with a particular culture may be "limited to a relatively small population or geographic location," J.A. 663, such that they are "uncommon" or "distinguished by some unusual quality," Puleo Memorandum at 1, J.A. 42. Moreover, knowledge gained through an employee's upbringing or "life experience," like other forms of specialized knowledge, may take years to acquire such that it is "beyond the elementary or introductory" and "greatly developed beyond the initial stage." *Id.* at 2, J.A. 43. Finally, knowledge acquired over time through cultural exposure combined with first-hand experience may distinguish an applicant from other employees who cannot learn without extensive training the skills, practices, instincts, and contextual judgments that the applicant has amassed and practiced since childhood. Such knowledge may naturally be thought of as "surpassing the usual[,] distinct among others of a kind," *id.* at 1, J.A. 42, or "at a higher level than others," *id.* at 2, J.A. 43.

Rather than address the dictionary definitions embraced by the agency's Puleo Memorandum, the Appeals Office tried to tether its exclusion of such cultural knowledge to the requirement that "specialized knowledge" be "*of the company product* and its application in international markets," or "of processes and procedures *of the company*." J.A. 663 n.6 (quoting 8 U.S.C. § 1184(c)(2)(B)). But nothing in that language broadly forecloses all forms of cultural knowledge, as the record here illustrates.

For example, Fogo de Chao came forward with evidence that its product itself is defined by the cuisine, serving style, and culinary ethos associated with a particular cultural practice in Southern Brazil. According to Fogo de Chao's submissions, the performance of cultural gaucho skills and an ability to share a comprehensive understanding of *churrasco* traditions with customers are indispensable aspects of the "company product." *See* Ohata Memorandum at 2, J.A. 49. In that regard, Fogo de Chao identified a number of concrete skills vital to its *churrascaria* business that relate to the preparation, presentation, and service of numerous types of meat, all of which "originate in the gaucho lifestyle of rural southern Brazil, and are passed on from generation to generation." J.A. 308. Those skills include, for example, the ability to be simultaneously responsible for (i) preparing and cooking five to six skewers of meat on an open grill, (ii) circulating through the dining room to carve meat for guests, (iii) educating those guests about both the cuts of meat being served and gaucho culinary and cultural traditions, and (iv) monitoring the estimated future demand for food over the course of the evening. J.A. 462. There is, moreover, uncontroverted evidence in the record that Gasparetto gained the knowledge, skill levels, and judgments specifically relevant to his duties at Fogo de Chao in material part through experience gained growing up in the south of Brazil and participating frequently in the *churrasco* tradition. *See* J.A. 540–541. Fogo de Chao thus provided evidence that the "chef plays a [critical] role within the petitioning organization," just as the Ohata Memorandum contemplated, Ohata Memorandum at 2, J.A. 49. Against that backdrop, the Appeals Office pointed to nothing in the statutory or regulatory text that explained closing its eyes completely to the entire category of culturally acquired knowledge and skills and their relevance to Fogo de Chao's product.

Instead, the Appeals Office highlighted the existence of other "cultural" nonimmigrant visa classifications in the statute, and reasoned that the absence of an express reference to culture in the L-1B visa program indicates a congressional intent to pigeonhole knowledge with a "cultural component" into those two contexts. *See* J.A. 663 & n.6 (citing 8 U.S.C. § 1101(a)(15)(P)(iii) (visas for an artist or entertainer seeking to enter the United States "to perform, teach, or coach as * * * an artist or entertainer * * * under a commercial or noncommercial program that is culturally unique"); 8 U.S.C. § 1101(a)(15)(Q) (visas for "a participant in an international cultural exchange program" that is "for the purpose of providing practical training, employment, and the sharing of the history, culture, and traditions of the country of the alien's nationality")); *see also Fogo de Chao*, 959 F. Supp. 2d at 46–47 n.4 (discussing provisions cited by the Appeals Office).

But those provisions simply beg the question of whether, in employing the even more textually capacious phrase "specialized knowledge," Congress left any room for culturally acquired knowledge and skills to be considered as an aspect of "specialized knowledge." Certainly nothing in the text of those two narrowly focused statutory provisions suggests that Congress meant to isolate cultural considerations to those two categories, especially since neither has anything to do with the type of knowledge deployed in the context of multinational business operations that Congress focused on for the L-1B visa program.

As for the previous administrative guidance in this area, the Appeals Office's decision lacks any reasoned explanation of why a chef who "entertain[s] in a particular manner," or has analogous "ancillary" duties, Ohata Memorandum at 2, J.A. 49, may be considered to have specialized knowledge, *unless—and only unless*—the particular entertainment

manner and ancillary duties involve demonstrating and sharing culturally rooted skills and knowledge.

Further, to the extent that the Appeals Office meant to suggest that a company must have an "ownership claim" in knowledge before it may qualify as "specialized," J.A. 664, it does not square that view with the Puleo Memorandum's recognition that an employee qualifying for this visa may obtain specialized knowledge through work at a different firm, Puleo Memorandum at 3, J.A. 44, or with the Appeals Office's own assurance that it was not resurrecting the proprietary knowledge standard that Congress discarded, J.A. 660.

To be sure, the Appeals Office could logically conclude that the mere *status* of being from a particular region or culture and any "authenticity" derived from that status alone is not "knowledge" within the meaning of 8 U.S.C. § 1101(a)(15(L). But the Appeals Office's wooden refusal to even consider culturally acquired knowledge, skills and experience as relevant to the "specialized knowledge" inquiry went far beyond that. And nothing in the regulations or previous guidance explains why informational knowledge, experience, and skills that would otherwise be considered specialized lose that status just because they were originally acquired through one's upbringing, family traditions, and life experience outside the workplace.

For those reasons, we conclude that the Appeals Office failed to ground its newly adopted, categorical exclusion of cultural knowledge in statutory text, statutory purpose, regulatory guidance, or reasoned analysis. This aspect of its decision accordingly lacks the power to persuade under *Skidmore* and, in light of the resulting failure to address otherwise relevant evidence, the decision before us does not

appear to have been "based on a consideration of the relevant factors," *Judulang*, 132 S. Ct. at 484 (quoting *State Farm*, 463 U.S at 43). The agency's judgment, moreover, "was neither adequately explained in its decision nor supported by agency precedent," and thus it fails the requirement of reasoned decisionmaking under arbitrary and capricious review as well. *See Fox*, 684 F.3d at 75 (quoting *Siegel v. SEC*, 592 F.3d 147, 164 (D.C. Cir. 2010)).

The Service nevertheless retains substantial discretion in considering this question anew on remand. The statutory definition provides little guidance on this specific issue, and it is for the agency in the first instance to formulate a rule that articulates whether and when cultural knowledge can be a relevant component of specialized knowledge. It likewise is for the agency to articulate, if deemed appropriate, a line between, on the one hand, actual skills and knowledge derived from an employee's traditions and upbringing, and, on the other hand, the simple status of being from a particular region. *See Orlando Ventura*, 537 U.S. at 16–17. We hold only that, given the statutory text, the dictionary definitions embraced by the agency, and the prior Service guidance the agency says it was following in this case, we cannot sustain the Appeals Office's decision on the given rationale that cultural knowledge is categorically irrelevant to "specialized knowledge" without a more reasoned explanation from the agency.

### 2. *Consideration of Economic Inconvenience*

Fogo de Chao also argues that the Appeals Office's decision failed to hew to the Puleo and Ohata memoranda because the decision did not factor in the distinct economic burden that denying Gasparetto's transfer to the United States would inflict on its business. In that regard, Fogo de Chao

presented evidence to the Service showing that each of its *churrasqueiros* went through an 18- to 24-month training period, and that even after that training period, its non-Brazilian *churrasqueiros* still were not performing a majority of the duties of the position Fogo de Chao requires.

Fogo de Chao's assertion that such evidence should be considered has substantial force. Agency guidance specifically identifies the "difficult[y]" and "significant economic inconvenience" entailed in "impart[ing]" knowledge "to another individual," Puleo Memorandum at 3, J.A. 44, including whether the knowledge could be transferred within a "reasonable period of time," Ohata Memorandum at 3, J.A. 50, as relevant indicia of "specialized knowledge." It would be difficult for the Appeals Office to plausibly claim, as it did here, to be following this guidance while dismissing altogether the relevance of such natural proxies for economic inconvenience as the amount of in-house training a company's employees would have to receive to acquire the knowledge in question.

Moreover, consideration of evidence of this type provides some predictability to a comparative analysis otherwise relatively devoid of settled guideposts. After all, to understand what is "specialized" knowledge, the agency needs to define with consistency a comparative baseline. "An item is special only in the sense that it is not ordinary; to define special one must first define what is ordinary." *1756, Inc. v. Attorney General*, 745 F. Supp. 9, 14 (D.D.C. 1990). Both before and after the 1990 amendment, the statute itself provided little guidance regarding the appropriate "baseline of ordinary knowledge." *Id.* at 15.

As the parties note, the Ohata Memorandum disambiguated the inquiry at the margins by identifying the

"practitioners in the alien's field of endeavor" as the relevant comparator. But, for the most part, that simply kicks the interpretive can down the road, leaving the scope of the relevant "field of endeavor" undefined. That specialized knowledge may ultimately be a "relative and empty idea which cannot have a plain meaning," Department Br. 22–23 (quoting *1756, Inc.*, 745 F. Supp. at 15), is not a feature to be celebrated and certainly not a license for the government to apply a sliding scale of specialness that varies from petition to petition without explanation. Suddenly departing from policy guidance and rejecting outright the relevance of Fogo de Chao's evidence of economic inconvenience threatens just that.[8]

It is not fair to say, however, that the Appeals Office decision ignored economic-inconvenience considerations *altogether*. After stating that the transferability of knowledge "is not a determining factor," J.A. 666, the Appeals Office discussed how easily at least some of the ancillary skills of a *churrasqueiro* chef like Gasparetto may be transferred. The

---

[8] While Fogo de Chao does not press this point as a separate objection, the government appears to have conceded at oral argument that the relevant comparator for Fogo de Chao's petitions filed on behalf of its *churrasqueiro* employees may have changed as *churrascarias* became more common in the United States. *See* Oral Arg. Tr. 29:12–30:9. The Appeals Office decision noted that the Vermont Service Center Director had identified the "popularity" of *churrascarias* as a potential factor distinguishing this denial from what Fogo de Chao asserted were more than 200 earlier approvals. But it is not clear that the Appeals Office itself adopted that reasoning. J.A. 676. And doing so would seem to contradict the Appeals Office's express disavowal of a "specialized knowledge" test that turns on the availability of such knowledge in the U.S. labor market.

decision thus noted that, "[w]hile knowledge specific to Brazilian gaucho culture is not widely held by skilled chefs, the petitioner has not supported its claim that this knowledge is so complex that it couldn't be mastered within a reasonable period of time by an employee who was otherwise trained in the *churrasqueiro* method." J.A. 670.

Nevertheless, the Appeals Office's consideration of the difficulties Fogo de Chao says it confronts in teaching *churrasqueiro* skills was infected by its legally erroneous, categorical dismissal of culturally acquired skills and knowledge. The Ohata Memoranda is explicit that "the length and complexity" of training and the skills "gained from significant experience" are important indicia of specialization. *See* Ohata Memorandum at 2, 4, J.A. 49, 51. Yet the record indicates, *see supra* at 22–23, that cultural acquisition is simply an immersion form of skills-training and front-line experience. The Appeals Office decision was devoid of any reasoned explanation as to why training and skills-acquisition can qualify as specialized if obtained from a corporate instructor, but categorically cannot just because they are learned from family or community members.

We do not know whether the Appeals Office would resolve this issue differently if it more directly addressed Fogo de Chao's economic-inconvenience evidence and grappled specifically with the difficulties Fogo de Chao asserted in transferring culturally rooted knowledge and experience acquired over a decade or more to new chefs lacking any analogous baseline set of skills or experience. In addition, once the role of cultural knowledge is reconsidered, the agency may weigh differently Fogo de Chao's evidence that the role its Brazilian *churrasqueiros* perform combines both cultural and a significant period of in-house training. For those reasons, we remand this issue to the agency for

further consideration in conjunction with its consideration of the role of culturally acquired knowledge and skills.

### 3. *Inconsistency with Prior Rulings or Precedent*

Fogo de Chao raises additional challenges to the legal standard applied by the Appeals Office, all of which are grounded in claims of inconsistency with previous Service decisions or other precedent. We find no merit in those objections on this record.

*First*, Fogo de Chao argues that the denial of a visa in this case was an abrupt and unexplained departure from prior agency practice granting such visas without the cultural-knowledge-free evidentiary demand imposed here. Specifically, Fogo de Chao asserts that, from 1997 to 2006, 251 of its previous visa petitions for *churrasqueiro* chefs were approved. The Department does not dispute that many such petitions were approved, but counters that, during the same time period, more than forty petitions were denied. The Department then, as the Appeals Office did, dismisses any previously approved petitions—to the extent they were factually similar to the Gasparetto petition—as "material and gross error." J.A. 677.

The Department is correct that "[t]he mere fact that the agency, by mistake or oversight, approved" a visa petition "on one occasion does not create an automatic entitlement to the approval of a subsequent petition." *Royal Siam Corp. v. Chertoff*, 484 F.3d 139, 148 (1st Cir. 2007). Yet it may be that a pattern of visa grants of sufficient magnitude could obligate the agency to provide a "reasoned explanation for * * * treating similar situations differently," *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995)—or at least something more reasoned than confessing a decade-long pattern of "material and gross error."

We need not resolve that question here, however. Although Fogo de Chao asserted that the prior petitions were factually equivalent, it never introduced any evidence corroborating that assertion. Nothing in the administrative record reveals whether even a sampling of those cases involved factually and legally similar contexts. Without such a showing, we cannot conclude that the Department in fact treated "similar situations differently." *ANR Pipeline*, 71 F.3d at 901.

Fogo de Chao's detailed efforts to distinguish the denial of an L-1B visa classification to another Brazilian steakhouse chef in *Boi Na Braza Atlanta, LLC v. Upchurch*, No. 3:04-cv-2007-L, 2005 WL 2372846 (N.D. Tex. Sept. 27, 2005), *aff'd* 194 Fed. App'x 248 (5th Cir. 2006), prove the point. Visa decisions can be fact-intensive, and assessing the evidentiary record behind any such determination is essential to evaluating the reasonableness of the agency's decision. *See IKEA US, Inc. v. Department of Justice*, 48 F. Supp. 2d 22, 25 (D.D.C. 1999) (INS did not act arbitrarily and capriciously in failing to distinguish previous visa petition's approval where the employer failed to submit the file to INS for its consideration), *aff'd* No. 99-5159, 1999 WL 825420 (D.C. Cir. Sept. 27, 1999). The evidentiary gap is particularly hard to understand given that the prior visa decisions involved Fogo de Chao's own employees, and so presumably the company had the necessary information at hand.

Rather than provide any of that data, Fogo de Chao pointed to two reports as evidence of inconsistent treatment. *See* Fogo de Chao Opening Br. 46–51, 62–63 (citing DEPARTMENT OF HOMELAND SECURITY OFFICE OF THE INSPECTOR GENERAL, REVIEW OF VULNERABILITIES AND POTENTIAL ABUSES OF THE L-1 VISA PROGRAM (Jan. 2006), *reproduced at* J.A. 496–538; UNITED STATES CITIZENSHIP

AND IMMIGRATION SERVICES OMBUDSMAN, ANNUAL REPORT 2010 (June 30, 2010), *reproduced at* Opening Br. Addendum 163–306).  Neither substantiates Fogo de Chao's claim.

To start with, the 2006 report from the Department's Office of the Inspector General, and in particular the portion focusing on the L-1B visa program, simply discusses in very general terms the 1990 legislative amendment and the Department's interpretive memoranda.  While the report states that the Department has "little room" to tighten the relevant standard administratively, J.A. 506, that simply begs the question of how that standard has been applied across cases over the years.  It thus does nothing to document an actual shift in how factually similar petitions have been disposed of either generally or in connection with Fogo de Chao's *churrasqueiros* specifically.

The 2010 report from the Service's Ombudsman, for its part, criticizes an earlier Appeals Office decision for casting doubt on the authoritativeness of the Puleo Memorandum.  But even assuming that taking issue with an internal agency guidance document could constitute inconsistency in any legally relevant sense, the Appeals Office decision under review neither cites that disapproved ruling nor discounts the Puleo Memorandum.  Quite the opposite, the Appeals Office describes the Puleo Memorandum as the "key agency document relating to the adjudication of L-1B specialized knowledge visa petitions," J.A. 650, and discusses it at length in its analysis, *see* J.A. 650–651, 653–654, 663, 666.

*Second*, Fogo de Chao argues that the Department's "narrowly drawn" decision here departs from prior precedent and legislative history that endorse a more expansive interpretation of the "specialized knowledge" standard.  That argument suffers from the same flaw as the claim of

inconsistent treatment because Fogo de Chao never demonstrates how the actual content of any prior interpretations differed from the Appeals Office's analysis in a way that is relevant to this case.

All agree that the 1990 legislation broadened the "specialized knowledge" definition in two specific respects. It overrode agency precedent requiring that the knowledge or skill be (i) "proprietary" and (ii) "not readily available in the United States." *Compare* 8 U.S.C. § 1184(c)(2)(B), *with* 52 Fed. Reg. at 5752. To the extent that the 1990 Act eliminated those two limitations on "specialized knowledge," it is true that the standard became "less[]" restrictive than the regulatory definition that immediately preceded it. Puleo Memorandum at 1, J.A. 42. The problem for Fogo de Chao is that being "less" restrictive in two specific respects is fully consistent with remaining a "still high" and exacting standard, Puleo Memorandum at 1, J.A. 42, as long as that standard does not revive the two limitations that Congress displaced and represents a reasonable exercise of regulatory discretion.

The legislative history on which Fogo de Chao relies does not help its cause. A House Report stating that the "specialized knowledge" standard was "broadened to accommodate changes in the international arena," H.R. Rep. No. 723(I), 101st Cong., 2d Sess. 69 (1990), simply raises the question of how much and in what manner the statute was expanded. Worse still for Fogo de Chao, the Report's list of the changes designed to broaden the program's reach did not include the amendment of "specialized knowledge." *See id.* Instead, the purpose identified for the "specialized knowledge" amendment was simply to provide "more specificity" to the statutory term, addressing a problem that "[v]arying interpretations" by the agency "ha[d] exacerbated." *Id.*

For that reason, the Service's citation to pre-1990 precedent does not demonstrate that it applied a standard inconsistent with the new definition, as long as those authorities were applied consistently with superseding congressional direction. *See Brazil Quality Stones, Inc. v. Chertoff*, 531 F.3d 1063, 1070 n.10 (9th Cir. 2008) (noting in L-1A visa context that reference to pre-1990 precedent was appropriate where the precedent addressed an aspect of the definition of "managerial capacity" unaffected by the 1990 Act).

For similar reasons, Fogo de Chao's argument that the previous visa approvals or unspecified precedent established a "definitive interpretation" of the Service's regulation that can only be changed through notice-and-comment rulemaking or formal adjudication fails. *See* Fogo de Chao Opening Br. 50 (quoting *Alaska Professional Hunters Ass'n v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999)). Simply identifying outcomes, stripped of their contextual analysis, falls far short of the documented record of "express, direct and uniform interpretation" by the agency required before a fixed legal rule will be discerned. *Association of American Railroads v. Department of Transp.*, 198 F.3d 944, 949 (D.C. Cir. 1999).

Moreover, a definitive legal rule cannot be wrung out of a pattern of decisions unless the decisionmaker has "the authority to bind the agency." *Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1040 (D.C. Cir. 2008). No such authority has been established here where (i) the service centers that granted Fogo de Chao's prior petitions lacked the authority to bind the agency; (ii) from all that Fogo de Chao has shown, none of the decisions on which it purports to rely were designated precedential; and (iii) each decision was expressly "based on the facts and circumstances of each individual case." J.A. 660.

In sum, based on the limited showing that Fogo de Chao has made both here and before the Service, it has not met its burden of demonstrating either an unexplained break from past practice or settled law, or unreasoned differentiation in the treatment of similar cases. Of course, to the extent that the "material and gross error" that the agency indicated might be lurking in its prior decisions was the consideration of cultural knowledge, it remains open to the Appeals Office on remand to consider the significance, if any, of that prior pattern of decisionmaking.

### B. The Service's Consideration of Evidence

#### 1. *Proof of Gasparetto's Training and Work Experience in Brazil*

Beyond its articulation of the relevant legal standard, the Appeals Office relied on two related evidentiary conclusions in denying the Gasparetto petition. Specifically, the Appeals Office found that the company had failed to establish that Gasparetto had either (a) completed the company's mandatory training program or (b) worked a sufficient amount of time in the *churrasqueiro* role to be eligible for transfer. Fogo de Chao disputes the agency's factual findings on both points. We find merit in the first of those arguments; the second point had no apparent independent effect on the Appeals Office decision.

*First*, Fogo de Chao challenges the Appeals Office's finding that there was insufficient evidence of Gasparetto's completion of the company's internal 18- to 24-month *churrasqueiro* training program, which is a prerequisite before an employee may be considered for transfer to the United States.

We agree that this conclusion is not supported by substantial evidence. Frankly, the Appeals Office's reasoning on this point is hard to understand. It said in its decision that Fogo de Chao "did not provide any documentation to confirm the beneficiary's completion of such training for the record," and that, "[w]ithout documentary evidence to support the claim, the assertions of counsel will not satisfy the petitioner's burden of proof." J.A. 664 (citations omitted). But Fogo de Chao's evidence of Gasparetto's completion of the training program went far beyond the "assertions of counsel," and even beyond the Chief Executive Officer's representations in the cover letter, which the Department now claims was the fatal evidentiary shortfall. Department Br. 48–49. Specifically, the uncontradicted evidence before the Appeals Office documenting Gasparetto's completed training included (i) a *sworn affidavit* submitted by Fogo de Chao's Chief Executive Officer attesting that Gasparetto had "completed the training program in Brazil," J.A. 460, (2) Gasparetto's *curriculum vitae* stating that he "graduated and specialized as waiter churrasqueiro" while working at a Fogo de Chao restaurant in Sao Paulo, J.A. 541, and (3) the letter from a Brazilian nutritionist concluding, after reviewing Gasparetto's *curriculum vitae* and information on the *churrasqueiro* position at Fogo de Chao, as well as interviewing Gasparetto, that he had the cultural background and restaurant skills necessary to fill that position, J.A. 539. None of that additional evidence is referenced in the Appeals Office opinion. *See* J.A. 664–666, 673–674.

While the substantial-evidence standard of review is generous, it is not boundless; it does not allow an agency to close its eyes to on-point and uncontradicted record evidence without any explanation at all. *See Soltane*, 381 F.3d at 151 ("[A]n agency is generally under at least a minimal obligation to provide adequate reasons explaining why it has rejected

uncontradicted evidence."). That is especially true here where at no time prior to reopening the administrative case had the Service questioned the sufficiency of Fogo de Chao's proof on this matter or requested further evidence.

*Second*, and relatedly, Fogo de Chao challenges the Appeals Office's conclusion that Gasparetto appears to have held the same position throughout his time working for Fogo de Chao, and, as a result, either was able to work as a *churrasqueiro* chef without any training or had not worked a full year in a specialized knowledge capacity before his proposed transfer to the United States.

Fogo de Chao argues that the Appeals Office improperly focused on Gasparetto's job title ("waiter churrasqueiro" or "*garcon churras*," J.A. 339–350, 540), rather than on his job duties. That argument would have more traction if Fogo de Chao had identified evidence in the record describing when and how Gasparetto's *duties* changed as a result of the training, even if his *position* remained the same. The record nonetheless does indicate that, while the company hires people whose preexisting skills and knowledge allow them to perform the *churrasqueiro* chef duties, the training remains necessary to some extent to instruct those chefs in how to apply their knowledge in Fogo de Chao's business in international markets. There thus is no apparent inconsistency in Gasparetto's duties or title remaining the same while he completed his training. In any event, regardless of whether the inconsistency in Gasparetto's duties and title that the Appeals Office perceived is borne out by the record, that gap appears to be of no moment because neither the Appeals Office decision nor the Department on appeal identifies that concern as an independently sufficient basis for the denial of Gasparetto's visa.

## 2. *Additional Evidentiary Objections*

Fogo de Chao raises a number of objections to the second evidentiary pillar underlying the Appeals Office decision: that Fogo de Chao had not established that the *churrasqueiro* position itself requires "specialized knowledge." We need not wade into those disputes, however, because the Appeals Office's conclusion that culturally acquired knowledge is categorically irrelevant to showing "specialized knowledge" pervaded its analysis of the *churrasqueiro* position as well.

The Appeals Office opened this portion of its analysis by reiterating that "the beneficiary's knowledge of the culture and culinary traditions of his native region of Brazil is general knowledge," and concluded that it is such cultural and traditional knowledge "that equips him to be a *churrasqueiro* chef in the petitioner's industry." J.A. 666. Similarly, Fogo de Chao submitted an expert report explaining the business's critical reliance on the presence of a "core group" of Brazilian *churrasqueiros* at each of its restaurants, J.A. 672, and indicating that the Brazilian *churrasqueiros* have some duties that are distinct from Fogo de Chao's non-Brazilian employees, *see* J.A. 307, 309. The Appeals Office dismissed that evidence by reiterating its conclusion that "an alien cannot qualify for this classification based primarily upon his or her life experience or culture." J.A. 672. Another expert's report was dismissed because "the L-1B specialized knowledge visa has no cultural component." *Id.*

While Fogo de Chao has not persuasively responded to every evidentiary defect identified by the Appeals Office, it did submit evidence, including an expert's report, addressing the distinction between its Brazilian and non-Brazilian *churrasqueiro* employees. The Appeals Office disregarded this evidence as part and parcel of its as-yet unjustified

categorical exclusion of cultural knowledge. Accordingly, the Appeals Office's factual conclusions must be remanded for further explanation as well.

## C. Alleged Prejudgment by the Service

Finally, Fogo de Chao argues that the Service's process as a whole was tainted because, in its view, the agency had prejudged the Gasparetto petition. Where a single agency decisionmaker is challenged in this fashion, we "will set aside an official's decision not to recuse 'only where he has demonstrably made up his mind about important and specific factual questions and is impervious to contrary evidence.'" *Power v. FLRA*, 146 F.3d 995, 1001–1002 (D.C. Cir. 1998) (brackets and additional internal quotation marks omitted) (quoting *Metropolitan Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1165 (D.C. Cir. 1995)). Fogo de Chao has not met that high burden.

The sole, specific evidence of alleged prejudgment proffered is that, in opposing Fogo de Chao's motion to refer this case to mediation, the government's opposition brief referenced the Service's "determination that these individuals do not qualify for L-1B 'specialized knowledge' visas," and concluded that the parties "are at an impasse." J.A. 27. While that statement was made shortly after the agency had reopened the proceedings on Gasparetto's petition, it was argumentation in a brief made in connection with settlement discussions encompassing, on Fogo de Chao's part, not just the Gasparetto visa application, but also its future petitions as well. *Id.* at 27–28.

Equally importantly, the sentence in question was not authored by the Vermont Service Center Director who was considering Fogo de Chao's application upon reopening or by any member of the Appeals Office. It was made by litigation

counsel in a court filing. That does not come close to demonstrating that "the *final decisionmaker* has * * * made a decision" in advance of further proceedings. *Volvo GM Heavy Truck Corp. v. Department of Labor*, 118 F.3d 205, 214 & n.12 (4th Cir. 1997) (rejecting attempt to rely on agency litigating position) (emphasis added).

Fogo de Chao's reliance on *Cinderella Career and Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970), is misplaced. In that case, right after the Federal Trade Commission staff announced its intention to appeal a decision to the full Commission, the Commission's Chairman gave a speech citing two examples of unfair and deceptive practices drawn directly from the case he was to hear. *See id.* at 589–590. We concluded that the Chairman's failure to recuse was a denial of due process because "a disinterested observer may conclude that the agency has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Id.* at 591 (brackets omitted) (quoting *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 469 (2d Cir. 1959)).

That bears no resemblance to this case. An isolated statement in an adversarial court filing by counsel reciting the agency's litigation position does not remotely establish that the actual decisionmaker has a closed mind and is impervious to evidence or argument.

## D.  Appropriate Relief

In reviewing agency action under 5 U.S.C. § 706(2), this court is required to take "due account * * * of the rule of prejudicial error," *id*. Where, as here, an agency has set out multiple independent grounds for a decision, "we will affirm the agency so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable." *BDPCS,*

*Inc. v. FCC*, 351 F.3d 1177, 1183 (D.C. Cir. 2003) (Roberts, J.). Where the agency has not afforded individual weight to the alternative grounds, however, the court may uphold the decision only "as long as one [ground] is valid and the agency would clearly have acted on that ground even if the other were unavailable." *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 939 (D.C. Cir. 2011) (internal quotation marks omitted) (quoting *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006)).

Here, the insufficiently reasoned, categorical rejection of cultural knowledge as a relevant component of "specialized knowledge," the blinkered review of the evidence of Gasparetto's training, and the agency's reliance on its cultural-knowledge bar in multiple aspects of its decision preclude us from confidently saying that the agency would have resolved the Gasparetto petition in the same manner absent those errors. Indeed, the Appeals Office itself described the role of cultural knowledge—"whether a beneficiary's life experience and inherent knowledge of his or her own native culture and traditions can constitute 'specialized knowledge' within the meaning of the statutory and regulatory definitions"—as "a critical question before [it]." J.A 662. Given the errors identified in that ruling, along with other missteps in its analysis, "[t]he 'proper course' is * * * to 'remand to the agency for additional investigation or explanation.'" *Soltane*, 381 F.3d at 152 (quoting *Florida Power & Light Co. v. Lorion*, 170 U.S. 729, 744 (1985)); *see also Love Korean Church v. Chertoff*, 549 F.3d 749, 759–760 (9th Cir. 2008) (same, vacating the Appeals Office's decision).

Before the district court, Fogo de Chao also sought mandamus relief and to compel agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1).

While we are mindful of the length of time these proceedings have already consumed, Fogo de Chao has not argued its entitlement to any of those more extraordinary remedies on appeal, nor has it demonstrated that this case warrants a remand to the agency with specific instructions. We are confident that the Department will handle this matter with appropriate dispatch and, if not, Fogo de Chao can seek relief from the district court in the first instance.

In closing, we pause to note our puzzlement over the dissent's disagreement. For the most part, the dissenting opinion opposes what it perceives to be Fogo de Chao's "argument" (Dissent at 3)—which is not what is under review here. And it endorses a perceived agency "position" (Dissent at 2), but makes no effort to defend the agency's actual decision adopting a categorical legal rule against cultural knowledge and skills forming any component of "specialized knowledge."

Specifically, the dissenting opinion "fully agree[s]" with what it labels "the agency's longstanding position" that "one's country of origin, or cultural background, does not constitute specialized knowledge." Dissent at 2. There is, however, nothing "longstanding" about the cultural-knowledge bar. Quite the opposite, it was the agency decision under review here that gave birth to that rule. *See* J.A. 662 (identifying as a "critical question" whether an employee's "life experience and inherent knowledge of his or her own culture and traditions can constitute 'specialized knowledge'"); J.A. 571 (agency determination that the case presents that "unusually complex or novel issue").

To the extent the dissenting opinion's concern is simply with the proposition that an individual's country of origin or background—the "authentic[ity]" of that person's national

identity (Dissent at 2)—constitutes specialized knowledge, we may well agree. It may be that the agency could reasonably conclude that mere background and cultural identity divorced from distinct knowledge and skills seem far removed from the concept of "specialized knowledge." *See supra* at 25–26. But under settled principles of administrative law, it is for the agency to make such a judgment in the first instance, rather than for the dissent to write it without any citation to the actual agency decision under review and then singlehandedly declare it the agency's own "position" (Dissent at 2). *See, e.g.*, *Calpine Corp. v. FERC*, 702 F.3d 41, 46 (D.C. Cir. 2012) ("[I]t is axiomatic that agency decisions may not be affirmed on grounds not actually relied upon by the agency."); *Otay Mesa Property, L.P. v. Department of Interior*, 646 F.3d 914, 918 (D.C. Cir. 2011) (noting that, if a particular conclusion in fact served as the agency's basis for arriving at a decision under review, the agency "must say so in its agency decision and justify that determination").

Perhaps, instead, the dissenting opinion means to embrace the agency's categorical rule woodenly excluding any and all knowledge or skills acquired by an employee solely because those skills and knowledge were learned from family or community rather than in-company trainers. But in so doing, the dissenting opinion fails to identify what in the "immigration statutes as written" (Dissent at 4) or the articulated reasoning of the agency decision makes the *source* of specialized knowledge singlehandedly dispositive. It thus remains a mystery after reading the dissent why (for example) a chef "singing or entertaining in a particular manner" in a themed restaurant, Ohata Memorandum at 2, J.A. 49, may have specialized knowledge if that ability to entertain came from in-house training, but is categorically disqualified if the same knowledge derives from a decade or more of actual life experience learning and performing those skills.

The dissenting opinion separately objects that the majority opinion makes an unwarranted evidentiary judgment by "say[ing] * * * that Fogo de Chao may have put forth sufficient evidence that American chefs could not be trained to do these jobs within a reasonable amount of time." Dissent at 4. As the portion of the majority opinion that the dissenting opinion cites demonstrates, however, no such sweeping evidentiary judgment has been made. We hold only that the agency must actually apply its own legal test and itself address directly whether or not Fogo de Chao's evidence of training difficulties demonstrated an inability to train domestic workers within a "reasonable period of time," Ohata Memorandum at 3, J.A. 50, rather than using its legally erroneous categorical rule to detour around the reasonable-training issue. *See supra* at 28-30, 38-39, 40-41.[9]

Moreover, if this case were really just about whether "American chefs either can't learn to cook or won't cook Brazilian steaks" (Dissent at 3), that surely would not have taken a 53-page agency opinion addressing what the Director deemed to be "an unusually complex or novel issue," J.A. 571. The dissenting opinion's view backhands (i) the actual description of the *churrasqueiros*' duties in the record, J.A. 462, which outlines seventeen distinct cooking and non-cooking skills that must be acquired, (ii) the Ohata Memorandum's express recognition that cooking combined with "ancillary" duties could constitute specialized knowledge, J.A. 49, (iii) the agency's prior practice granting more than 200 of Fogo de Chao's L-1B applications for its

---

[9] An additional problem is that the Appeals Office reached that categorical judgment by cherry picking from, rather than "adher[ing] to and appl[ying]" (Dissent at 1), the two prior policy memoranda it purported to follow. *See supra* at 21–25.

*churrasqueiros*, and (iv) the fact that Fogo de Chao commonly or even predominantly hires American chefs in its U.S. restaurants, *see* J.A. 309, 454; Oral Arg. Tr. 57:19–22. Fogo de Chao's position here is simply that it needs Gasparetto to help train those American chefs in *churrascaria* techniques and knowledge, and to perform the service- and team-related skills that Fogo de Chao says have proven particularly difficult to transfer.

Finally, while the dissenting opinion defends the agency decision as a "clamp[] down" following the 2004 Ohata Memorandum (Dissent at 5), it does so for policy reasons that are entirely absent from the agency decision under review. Indeed, the agency decision refused to even acknowledge the shift in approach that the dissent articulates on its behalf. On top of that, the government does not even contest that it continued to confer L-1B status on Fogo de Chao's *churrasqueiros* for at least two more years *after* the Ohata Memorandum issued. *See* J.A. 676-677; Fogo de Chao Opening Br. 9 n.2; Oral Arg. Tr. 16:22-17:18; *cf. SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943).[10]

---

[10] To the extent the dissenting opinion's concern is with "economic expediency" and the displacement of American workers (Dissent at 3-4), it was Congress, not Fogo de Chao, that created the L-1B visa program to bring foreign workers with specialized knowledge into United States businesses. *See, e.g.,* H.R. Rep. No. 851, 91st Cong., 2d Sess. 5–6 (1970) ("[I]ntercompany transfers have contributed immeasurably to the growth of American enterprise" and "international trade."). Furthermore, it was the Executive Branch that decided both (i) that the time and resource-expenses associated with training domestic workers (including chefs and specialty cooks that have ancillary duties) should inform the "specialized knowledge" inquiry, and (ii) that Fogo de Chao's *churrasqueiro*

We accordingly remand the matter to the district court with instructions to vacate the Appeals Office's decision and to remand to the agency for further proceedings consistent with this opinion.

*So ordered.*

---

chefs met that test more than 200 times (apparently without creating any "substantial loophole" in the visa program (Dissent at 2)). Perhaps the dissent disagrees with those policy judgments or the agency's past practice. But our Constitution places such sensitive immigration and economic judgments squarely in the hands of the Political Branches, *not* the courts. *See Arizona v. United States*, 132 S. Ct. 2492, 2510 (2012); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches[.]").

KAVANAUGH, *Circuit Judge*, dissenting:  Fogo de Chao operates Brazilian steakhouses in the United States.  It wants to employ Brazilian chefs rather than American chefs in these steakhouses.  The question under the immigration statute at issue in this case is whether Fogo de Chao's Brazilian chefs possess "specialized knowledge."  8 U.S.C. § 1101(a)(15)(L).  If so, these Brazilian chefs may obtain L1-B visas to work in the United States.

In 2004, United States Citizenship and Immigration Services (known as USCIS) announced its determination that foreign chefs seeking to work in ethnic restaurants in the United States "generally are not considered to have 'specialized knowledge.'"  USCIS Memorandum (Sept. 9, 2004) at 1, reprinted in Joint Appendix ("J.A.") 48.  In this case, USCIS adhered to and applied that now-longstanding agency policy, concluding that Fogo de Chao's Brazilian chefs do not possess specialized knowledge for purposes of this visa program.  The District Court upheld the agency's decision.

The majority opinion now overturns the agency's decision.  In doing so, the majority opinion says that it must decide the case without any meaningful deference (under *Chevron*, *State Farm*, or otherwise) to the agency's legal analysis and factual conclusions.  I will assume for the sake of argument that the majority opinion is right to afford no meaningful deference to the agency.  But even reviewing the matter de novo, I agree with the agency's decision and therefore would uphold it.

Fogo de Chao contends that Brazilian chefs have specialized knowledge based on: (i) the chefs' knowledge of Brazilian culture and culinary practices from growing up and learning how to cook meat in rural Brazil and (ii) the time it would allegedly take American chefs to learn how to cook

Brazilian steaks. The agency correctly rejected those arguments.

As to Fogo de Chao's first argument, its so-called "cultural" argument, I fully agree with the agency's longstanding position – which it relied on in this case – that one's country of origin, or cultural background, does not constitute specialized knowledge under this immigration statute for purposes of being a chef or otherwise working in an ethnic restaurant or bar in the United States. *See* 2004 USCIS Memorandum at 2-3. Fogo de Chao says that it wants "authentic" Brazilian chefs in its U.S. restaurants. Tr. of Oral Arg. 7, 19, 20, 22-23. But such a circular "foreign citizenship and cultural background constitute specialized knowledge for purposes of working in an ethnic restaurant or bar" argument would gut the specialized knowledge requirement and open a substantial loophole in the immigration laws.

As to Fogo de Chao's second contention – that the Brazilian chefs have specialized knowledge because it takes significant time for American chefs to learn how to cook Brazilian steaks – I agree with the agency that Fogo de Chao failed to prove that claim. Put simply, the record does not establish that Fogo de Chao's Brazilian chefs possess skills that American chefs cannot learn within a reasonable amount of time.[1] At oral argument, Fogo de Chao asserted that in "Fogo's experience," a cook "born in America" cannot learn to cook Brazilian steaks as well as a Brazilian-born person.

---

[1] Fogo de Chao agrees that the relevant question for this aspect of its argument is whether American chefs could be trained to do the job within a reasonable amount of time. *See, e.g.*, Tr. of Oral Arg. 4 ("Fogo completely agrees" with the proposition that "recipes and cooking techniques that could be learned by a chef through exposure to the recipe or cooking techniques for a brief or moderate period of time generally do not constitute specialized knowledge.").

Tr. of Oral Arg. 57. But the record demonstrates that Fogo de Chao's chefs perform tasks that can be readily learned by American chefs, such as talking with customers while cooking several cuts of meat on an open grill. *See* J.A. 631-32; *cf.* Maj. Op. at 23 (emphasizing that Fogo's chefs engage in "preparing and cooking five to six skewers of meat on an open grill," "circulating through the dining room to carve meat for guests," and "educating those guests about both the cuts of meat being served and gaucho culinary and cultural traditions"). Indeed, Fogo de Chao already employs *some* American chefs in its U.S. steakhouses, which belies Fogo's contention that Americans cannot do the job. Moreover, reading the record with just a dash of common sense tells us that chefs who happen to be American citizens surely have the capacity to learn how to cook Brazilian steaks and perform the relevant related tasks. To maintain otherwise, as Fogo de Chao does, is to imply that Brazilian chefs are essentially born with (or somehow absorb during their formative years) a cooking skill that cannot be acquired through reasonable training, which seems an entirely untenable proposition.

Ultimately, Fogo de Chao's argument is that American chefs either can't learn to cook or won't cook Brazilian steaks. *See, e.g.*, Tr. of Oral Arg. 7-9, 57. But the "Americans can't learn to cook" proposition is a factually unsupported stereotype that finds no home in the specialized knowledge visa program. And the "Americans won't cook" proposition in the end is just an economic argument. Like other restaurants, Fogo de Chao must compete in the chef market by offering better wages or benefits to attract quality chefs. Fogo de Chao undoubtedly would save money if it could simply import experienced Brazilian chefs rather than hiring and training only American chefs to cook at its steakhouses here in the United States. And at bottom, that

4

seems to be at least part of what is going on in this case – namely, Fogo's desire to cut labor costs masquerading as specialized knowledge. But under the provision of the immigration laws at issue here, mere economic expediency does not authorize an employer to displace American workers for foreign workers.

For its part, the majority opinion does not fully embrace Fogo de Chao's broad "cultural" argument. But the majority opinion says (contrary to the agency and the District Court) that Fogo de Chao may have put forth sufficient evidence that American chefs could not be trained to do these jobs within a reasonable amount of time. *See* Maj. Op. at 26-30. As I have explained, I respectfully disagree with that analysis of the factual record in this case.

* * *

The United States is a nation of immigrants. In our constitutional system, Congress and the President determine the circumstances under which foreign citizens may enter the country. The judicial task is far narrower: to apply the immigration statutes as written. By claiming that its Brazilian chefs possess "cultural" knowledge and skills that cannot be learned by Americans within a reasonable time, Fogo de Chao has attempted an end-run around the carefully circumscribed specialized knowledge visa program.[2] For a brief time, Fogo de Chao convinced some lower-level agency officials to issue specialized knowledge visas for its chefs. But in this case,

---

[2] In critiquing this dissent, the majority opinion says that sensitive immigration judgments are "squarely in the hands of the Political Branches." Maj. Op. at 46 n.10. It seems unusual for the majority opinion to rely on that principle in response to this dissent given that it is the majority opinion that overturns the decision of the Executive Branch in this case.

applying its definitive 2004 policy regarding foreign chefs,[3] the agency clamped down and said no to Fogo de Chao. This case does not raise the question of how other visa categories might apply to foreign workers such as these chefs. But under this provision of the immigration laws, I would uphold the agency's decision and affirm the judgment of the District Court. I respectfully dissent.[4]

---

[3] The agency decision in this case repeatedly referenced the agency's 2004 policy, stating for example: "The 2004 Ohata Memorandum indicates that chefs and specialty cooks presumptively do not have 'specialized knowledge' even if they possess knowledge of a restaurant's special food preparation techniques acquired through training. . . . Here, the petitioner claims that the knowledge required to perform the ancillary duties of a *churrasqueiro* chef comes primarily from the beneficiary's 'unique life experience' and upbringing in the gaucho culture, rather than from in-house training. The Ohata Memorandum makes no reference to cultural knowledge as a source of specialized knowledge." USCIS Appeals Office Decision at 45, reprinted in J.A. 670.

[4] Although I disagree with the majority opinion's conclusion, I note one point that might be relevant going forward. From my reading of the majority opinion, it appears that the agency could permissibly adopt a binding regulation (not just a policy memo) that would receive *Chevron* deference and that would make clear that workers such as these Fogo de Chao chefs do not possess specialized knowledge under this immigration statute. *See United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001). Whether the agency chooses to do so is of course up to the agency.